**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1540
_____

UNITED STATES OF AMERICA

v.

AMY GONZALEZ

Appellant

_____

No. 16-1559
_____

UNITED STATES OF AMERICA

v.

DAVID MATUSIEWICZ

Appellant

_____

On Appeal from the United States District Court for the
District of Delaware

(D.C. Nos. 1-13-cr-00083-001, 1-13-cr-00083-003)
District Judge:  Hon. Gerald A. McHugh

Argued:  February 7, 2018
_____

Before:  CHAGARES, SCIRICA, RENDELL, Circuit Judges.

(Opinion Filed:  September 7, 2018)

Jeremy H.G. Ibrahim, Sr.    **[ARGUED]**
P.O. Box 1025
1631 Baltimore Pike
Chadds Ford, PA 19317

        Counsel for Appellant Amy Gonzalez


Edson A. Bostic
Tieffa N. Harper            **[ARGUED]**
Office of the Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801

        Counsel for Appellant David Matusiewicz


David C. Weiss
Jamie M. McCall             **[ARGUED]**
Shawn A. Weede
Office of United States Attorney
1007 N. Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19801

Counsel for Appellee

Edward J. McAndrew
Lindsey B. Zionts
Ballard Spahr
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Counsel for Amici Curiae Beau Biden Foundation for
the Protection of Children, Delaware Coalition Against
Domestic Violence, National Center for Victims of
Crime, and National Network to End Domestic
Violence in support of Appellee

_____

OPINION

_____

CHAGARES, Circuit Judge.

I.    Introduction ...................................................4
II.   Facts and Procedural History .........................5
III.  Analysis .......................................................14
  A.   Sufficiency of the Evidence Challenge ....................14
  B.   Jury Instruction Challenges .......................................22
    1.   Lack of a Specific Unanimity Instruction ............23
    2.   "Death Results" Instruction ..................................31
  C.   Substantive Challenges to the Prosecution of the
       Case ..........................................................39

     1.    First Amendment ................................................. 39

     2.    Venue in Delaware ............................................ 47

    D.   Evidentiary Challenges ........................................... 49

     1.    Family Court Opinion ........................................ 50

     2.    Belford's Therapy Tapes and Emails .................. 57

       a.    Therapy Sessions ............................................. 57

       b.    Emails .............................................................. 61

       c.    Confrontation Clause ....................................... 62

     3.    Testimony of FBI Case Agent ............................ 64

     4.    Exclusion of Polygraph Rebuttal Evidence .......... 66

     5.    Character Evidence Cross-Examination ............... 69

    E.   Sentencing Challenges ............................................. 70

     1.    Fifth and Sixth Amendments ................................ 70

     2.    Official Victim Enhancement .............................. 72

     3.    Vulnerable Victim Enhancement ......................... 74

     4.    Eighth Amendment ............................................. 76

IV.  Conclusion ................................................................... 76

## I.  Introduction

This case concerns challenges by David Matusiewicz and Amy Gonzalez (together, the "defendants") to their convictions for conspiracy to commit interstate stalking and cyberstalking, interstate stalking resulting in death, and cyber stalking resulting in death, and to their resulting life sentences for conspiracy to commit interstate stalking and cyberstalking which resulted in the death of Christine Belford, the ex-wife of David Matusiewicz.  The defendants are siblings and were

indicted, along with their mother, Lenore Matusiewicz, after their father, Thomas Matusiewicz, shot and killed Belford and himself in the lobby of the New Castle County Courthouse. They engaged in a years-long conspiracy with Thomas Matusiewicz, an unindicted co-conspirator, to harass Belford, which ultimately resulted in her death. On appeal, each defendant challenges, inter alia, the constitutionality of the statutes under which they were convicted, the jury's verdict on sufficiency of the evidence grounds, various evidentiary rulings of the District Court, as well as numerous challenges to their sentences of life imprisonment. Faced with numerous issues of first impression in this complicated case, District Judge Gerald McHugh, sitting by designation, handled this case with exceptional precision and care. We will affirm the District Court in all respects.

## II. Facts and Procedural History

David Matusiewicz[1] and Christine Belford were married from 2001 to 2006, during which time they had three children, L.M.1, L.M.2, and K.M.1 (the "children"). The couple and their children also lived with Belford's one child from a previous marriage, K.M.2.[2] After their divorce, Belford and David engaged in a bitter custody dispute, during which David accused Belford of being an unfit mother and suffering from mental health disorders. On February 13, 2007, following an evaluation by a psychologist who determined that

---

[1] Hereinafter, we will refer to David Matusiewicz, Lenore Matusiewicz, and Thomas Matusiewicz, respectively, as David, Lenore, and Thomas.

[2] To protect their privacy, we will use only initials to refer to the children.

David's allegations were unfounded, the Delaware Family Court awarded joint custody of the children.

On August 26, 2007, rather than let the children return from staying with David to live with Belford, David, along with his mother Lenore, kidnapped L.M.1, L.M.2, and K.M.1 and absconded to Central America. During the kidnapping, David told L.M.1 that Belford had committed suicide. In March 2009, the children were located in Nicaragua and rescued, and David and Lenore were arrested. The children returned to live with Belford, who had been awarded sole custody during the kidnapping. David pleaded guilty to federal kidnapping charges and was sentenced to 48 months of imprisonment on December 10, 2009. Appendix ("App.") 137.

Later that month, while incarcerated, David sent a letter to his sister, Amy Gonzalez, in which he stated, "I'm done playing Mr. Nice Guy," and urged her to "begin making complaints anonymously and repeatedly to [Delaware Youth and Family Services]." App. 3389-90, 7222. He also instructed her to "make sure Melinda's website is up and has a true story on it and is well publicized." App. 3390, 7222. Beginning in December 2009, a webpage was published that identified Belford and her children by name and set forth detailed claims against Belford of sexual abuse, physical abuse, and neglect of the children. That website was registered to Melinda Kula, the sister-in-law of Thomas and Lenore. It stated that the "[a]ctual names were used by the request and with the permission of David Matusiewicz." App. 7882.

In March and April 2011, Gonzalez published three YouTube videos, which included secret recordings of Belford and the children taken by a private investigator; posts claiming

6

Belford sexually abused her daughter, L.M.1; and images of polygraph test results of Lenore and Gonzalez, which described the accusations of sexual abuse. From May 2011 through September 2012, David and Gonzalez had contact with David's former girlfriend, Cindy Bender, and enlisted her to probe Belford for details about her life and to share what she learned, which included information from Belford's private Facebook account.

Acting on instructions received from David while he was in prison, Lenore and Gonzalez mailed letters that accused Belford of sexual abuse to numerous media outlets, to the children's school and teachers, and to Belford's family members, neighbors, employer, church, and other members of her community. The defendants also mailed letters and cards directly to Belford and her children. Gonzalez and Thomas solicited their friends to drive past Belford's home and report on what they observed. The defendants also convinced a real estate agent in Delaware to conduct surveillance of Belford's house and to provide them with information about Belford's residence and about various persons who were part of Belford's life and who were coming and going from her home.

Between November 2010 and July 2011, the Delaware Family Court conducted a hearing over seven separate days on Belford's petition for termination of David's parental rights as to the children. On August 18, 2011, the Delaware Family Court entered an order terminating David's parental rights as well as Thomas's, Lenore's, and Gonzalez's familial rights (the "TPR Order"). App. 7827-68, 4310. The Delaware Supreme Court affirmed that decision. App. 2154-55. In spite of the TPR Order, the defendants continued to send letters to Belford's home and made extrajudicial contact with the

7

lawyers, judges, and witnesses involved in the TPR matter. Thomas and Lenore made numerous phone calls to the chambers of the judge overseeing a separate civil matter between Belford and the Matusiewicz family, during which they told the judge's assistant, referring to Belford, that the "bitch is going to get what is coming to her." App. 3057.

On December 1, 2011, Thomas and Lenore travelled to Delaware and showed up uninvited at Belford's house. Although Belford was not at home, the children and Belford's boyfriend were. Belford's boyfriend instructed Thomas to leave. This trip was ostensibly to visit the children, despite the fact that Delaware Family Court had previously denied petitions by both Thomas and Gonzalez to visit the children. The night before the trip, Thomas and Gonzalez exchanged emails in which Thomas informed Gonzalez of the visit, instructed her to clean out his home safe, and told her that he would let her know how things worked out. App. 3319-21, 8886. In response, Gonzalez gave Thomas her temporary cell phone number and told him to be careful. App. 8886. In the emails, Thomas and David refer to Belford by a nickname,"wb," which stood for "Whore Bitch." App. 3243-44. Thomas sent a letter to David after his visit that contained the details of what he had observed. App. 7226-28. After this visit, Belford took steps to sell her home and move. The defendants then obtained the real estate listing — before it was made publicly available — from the real estate agent whom they had enlisted to surveil Belford.

On November 1, 2012, David sent Gonzalez an email saying, "[p]repare yourself to be managing four by this time in 2013." App. 3460-61. Gonzalez responded to the email by stating that she was "praying for it." App. 3462. The

8

Government's case agent later testified that the reference to "four" equated to David's three children plus Gonzalez's one child. App. 3461.

On November 5, 2012, David filed a petition to reduce his back payments of child support in Delaware Family Court. A hearing was scheduled in Delaware, and although David was informed he could participate by phone as he resided with his family in Texas at the time, he chose to attend in person. David received permission from his probation officers to attend, but he failed to disclose to them that he could participate by phone or that his parents would be accompanying him. On February 4, 2013, David, Lenore, and Thomas drove to Delaware in two vehicles, which were loaded with an assault rifle, handguns, military-style knives, thousands of rounds of ammunition, restraints, body armor, binoculars, an electric shock device, gas cans, a shovel, photographs of Belford's children and residence, and handwritten notes about Belford's neighbors. Thomas left a note for Gonzalez in a hutch in the family's residence, instructing her to keep his guns for protection and that stated "hopefully we can end this BS now – up to Dave." App. 3318, 7461.

On February 11, 2013, Thomas and David entered the New Castle County Courthouse lobby, in Delaware, and remained there for approximately 25 to 30 minutes, during which time David and Thomas exchanged envelopes, before David passed through the security checkpoint. Belford entered the courthouse with her friend Laura "Beth" Mulford a short time later. Thomas then shot and killed both women, injured two police officers in an exchange of fire, and then shot himself in the head. Investigators recovered from Thomas's person two death certificates that were filled out with the names of

9

Belford and her family court attorney. Investigators also found papers containing Thomas's burial request during a search of David's person following his arrest.

On February 13, 2013 — two days later — Gonzalez submitted a petition for custody of the children to the Delaware Family Court in the New Castle County Courthouse, with a check dated February 12, 2013. App. 4306-07. The petition was denied. In the ensuing six months, Gonzalez continued to file additional custody petitions. App. 4307-12, 7974-8009. Gonzales also made repeated attempts to contact the children through the mail. App. 4312-13, 8542-45.

On August 6, 2013, David Matusiewicz, Lenore Matusiewicz, and Amy Gonzalez were indicted on the following counts: (1) conspiracy to commit interstate stalking and cyberstalking, in violation of 18 U.S.C. §§ 2261A(1) and (2), all in violation of 18 U.S.C. § 371; (2) interstate stalking in violation of 18 U.S.C. §§ 2261A(1), 2261(b) and 2; (3) interstate stalking resulting in the death of Belford, in violation of 18 U.S.C. §§ 2261A(1), 2261(b) and 2; and (4) cyberstalking resulting in the death of Belford, in violation of 18 U.S.C. §§ 2261A(2), 2261(b) and 2. Counts One and Four were against all defendants. Count Two was only against Lenore. Count Three was against David and Lenore. Thomas was listed as an unindicted co-conspirator in the indictment. All three defendants pleaded not guilty, and the case proceeded to trial.

We set forth a brief summary of the evidence introduced by the Government at trial relevant to the issues on appeal. This includes evidence that after the shooting, law enforcement officers found firearms and ammunition in the vehicles that the

Matusiewicz family had driven from Texas. The key to this vehicle was found on David's person. The Government also introduced evidence of a surveillance video from a Walmart parking lot in Maryland that depicted Thomas, David, and Lenore walking around the vehicle with its trunk open, demonstrating that all three knew of the weapons and ammunition.

Law enforcement recovered a red notebook entitled "Important Information for David Matusiewicz" from the vehicle that David and Thomas drove to the courthouse; the contents of this notebook were in Thomas's handwriting. App. 3224-35. Within were the real estate listing for and pictures of Belford's home, accompanied by handwritten notes identifying the bedrooms in which Belford and her children slept. It also contained personal, identifying information on Belford's family, lawyers, doctors, boyfriend, and employer, as well as a daily surveillance log tracking Belford's movements over a twelve-day period in March 2010. Additionally, there was a page marked "HL," which the Government argued stood for "hit list," that identified sixteen individuals, including the judges, lawyers, and witnesses involved in the prior federal kidnapping and family court cases. App. 3249-53, 5442, 6995.

The Government introduced evidence recovered from a search of Gonzalez's residence. This included large volumes of correspondence with third parties about the stalking campaign. It also introduced letters from Thomas to Gonzalez that they "must drink to WB's, [a nickname for Belford,] final day," that Belford "can not keep" the children "at all costs," and that Belford "can not [and] will not have our girls into her old age. Ain't gonna happen." App. 3442-43.

11

At trial, a key part of the Government's case was that the defendants' accusations that Belford sexually molested her children and suffered from mental health disorders were false and defamatory. The spreading of these false claims was an important part of the defendants' campaign to harass and intimidate Belford. The Government provided ample evidence demonstrating the falsity of these claims. Notably, L.M.1 testified that her mother did not abuse her, and refuted the specific claimed incidents of abuse advanced by the defendants. L.M.1 also testified that she was afraid when she learned of the allegations and saw her name and personal information online. The Government also provided the testimony of L.M.1's pediatrician and psychologist who corroborated that L.M.1 never reported nor showed any signs of abuse.

The Government also discredited the defendants' accusations of abuse by pointing out that the timeline of their claims of abuse did not add up. No accusations of sexual abuse were made prior to the kidnapping in August 2007. Evidence was introduced that at his TPR hearing, David testified that he kidnapped the children upon learning about the abuse in either July or August 2007. However, evidence also showed that David began preparing for the kidnapping as early as fall 2006. The Government introduced evidence that defendants gave contradictory and shifting statements about when and how they learned of the abuse, and about the details of the incidents of abuse. The Director of the Delaware Division of Family Services ("DDFS"), the state organization responsible for investigation of child abuse, also testified, explaining that DDFS did not open an investigation into the abuse because it

12

found that the defendants' contradictory claims lacked credibility.

Belford's eldest child, K.M.2, testified that she, her mother, and her siblings were aware of the defendants' conduct and it caused them to fear for their lives. L.M.1 also testified about her fear, and the pain of losing her mother. The Government also produced evidence from numerous third parties to whom Belford had confided her own fears of the defendants, resulting from their conduct. For example, Belford's therapist testified as to the emotional and psychological toll that the defendants' actions were having on Belford.

After a five week trial, the jury convicted the defendants on all counts. On February 18, 2016, the District Court held a sentencing hearing. The District Court applied a number of sentencing enhancements, including: (1) the first-degree murder cross-reference pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2A1.1; (2) the vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b)(1); and (3) the official victim enhancement pursuant to U.S.S.G. § 3A1.2(c)(1). App. 6057-6126. The District Court sentenced each of the defendants to a term of five years of imprisonment on Count One, and a term of life imprisonment for Count Four. App. 2-8, 10-15.[3] This timely appeal followed.

---

[3] Lenore died before the conclusion of her appeal, so her sentence was abated.

13

### III.  Analysis[4]

The defendants raise numerous challenges to their convictions and sentences.  David brings challenges to:  (1) the sufficiency of the evidence; (2) the lack of a specific unanimity instruction;  (3) the  District  Court's  "death  resulted" instruction; (4) the District Court's alleged judicial factfinding in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000), in imposing the sentence; (5) the application of the vulnerable victim and official victim sentencing enhancements; (6) the admission of the TPR Order into evidence; (7) the admission of Belford's past therapy sessions and emails into evidence; and (8) the testimony of the FBI case agent vouching for the weight of the case.  In addition to joining these challenges, Gonzalez also raises the following additional issues: (9) that the anti-cyberstalking statute violates the First Amendment and is void for vagueness; (10) that the District Court lacked jurisdiction to sit in the District of Delaware because venue was transferred out of Delaware; (11) that her polygraph evidence offered in rebuttal was erroneously excluded; (12) that the District Court erred in ruling that Government would be permitted to cross-examine any character witnesses about her prior conduct in relation to the kidnapping; and (13) that her sentence of life imprisonment violates the Eighth Amendment. We will address each of these issues in turn.

### A.  Sufficiency of the Evidence Challenge

---

[4] The District Court had jurisdiction over the underlying criminal proceedings pursuant to 18 U.S.C. § 3231.  We have jurisdiction over these direct appeals pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

14

"We apply a 'particularly deferential' standard of review to a challenge to the sufficiency of evidence supporting a jury verdict." United States v. Peppers, 302 F.3d 120, 125 (3d Cir. 2002) (quoting United States v. Cothran, 286 F.3d 173, 175 (3d Cir. 2002)).  Under this standard, we will affirm the verdict if "'any rational juror' could have found the challenged elements beyond a reasonable doubt, viewing the evidence in the manner that is most favorable to the government, neither reweighing evidence, nor making an independent determination as to witnesses' credibility."  Id. (quoting Cothran, 286 F.3d at 175).

Count One charged the defendants with conspiring to commit interstate stalking and cyberstalking, in violation of 18 U.S.C. § 371.  To establish a conspiracy under this section, the Government must prove:  (1) an agreement between two or more persons to commit the substantive offense; (2) that each defendant knowingly joined the conspiracy; and (3) an overt act committed by one of the conspirators in furtherance of the conspiracy.  See United States v. Gebbie, 294 F.3d 540, 544 (3d Cir. 2002).  This requires proof that a defendant has "knowledge of the conspiracy's specific objective."  United States v. Caraballo-Rodriguez, 726 F.2d 418, 431 (3d Cir. 2013) (en banc).  We have held that "a conspiratorial agreement can be proven circumstantially based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme."  United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007).

15

Count Three charged only David and Lenore with interstate stalking, in violation of 18 U.S.C. § 2261A(1).[5] To prove interstate stalking, the Government was required to prove that David:

> [(1)] travel[ed] in interstate or foreign commerce . . . [(2)] with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and [(3)] in the course of, or as a result of, such travel . . . engage[d] in conduct that--
>> (A) place[d] that person in reasonable fear of the death of, or serious bodily injury to—
>>> (i) that person;
>>> (ii) an immediate family member . . . of that person; or
>>> (iii) a spouse or intimate partner of that person; or
>> (B) cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress [to that person or their spouse, intimate partner, or immediate family member].

18 U.S.C. § 2261A(1).

Count Four, brought against all of the defendants, charged cyberstalking resulting in the death of Belford, in violation of 18 U.S.C. §§ 2261A(2), 2261(b), and 2. We have held that to prove

---

[5] Because Count Two was brought only against Lenore, it is not at issue in this appeal.

16

stalking under 18 U.S.C. § 2261A(2), the Government must establish that (1) the defendants used a facility of interstate commerce; (2) to engage in a course of conduct that places a person in reasonable fear of death or serious bodily injury, or causes substantial emotional distress, either to that person or to a partner or immediate family member; (3) "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate that person." 18 U.S.C. § 2261A(2); see also United States v. Fullmer, 584 F.3d 132, 163 (3d Cir. 2009). The statute defines a "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266. A defendant who violates § 2261A is eligible for a sentence of life imprisonment if the "death of the victim results." Id. § 2261(b)(1).

The defendants each argue that the evidence presented to the jury was insufficient to convict them of any of the counts in the indictment. Their sufficiency challenges revolve around the same argument that was presented to and rejected by the jury: that Thomas acted alone in killing Belford and the defendants neither knew about nor participated in his plan.[6] The defendants argue that there is insufficient evidence of a conspiracy because there was no evidence of an express agreement to stalk or kill Belford. They do not dispute the existence of their campaign to spread accusations that Belford sexually abused the children, but contend that it was not a stalking campaign because it was meant to spur an investigation of these claims, which the defendants purport to have sincerely believed. However, the jury was presented with

_____

[6] The defendants do not contest the interstate commerce elements of any of the counts.

17

overwhelming evidence demonstrating both that the sexual abuse accusations against Belford were false and that defendants knew that these allegations were false.

We have reviewed the substantial amount of evidence before the jury. Taken in the light most favorable to the Government, see Peppers, 302 F.3d at 125, the evidence is more than sufficient to support the jury's verdict in its entirety. Throughout the course of the five-week trial, the Government produced approximately 65 witnesses and over 760 exhibits, which show that the defendants conspired to engage in an escalating campaign of harassment, intimidation, and surveillance against Belford, all with the goal of regaining custody of the children. This three-year stalking campaign culminated in the murder of Belford in the New Castle County Courthouse lobby by Thomas, a member of the conspiracy.

Both David and Gonzalez were intimately involved in this stalking campaign and conspiracy. The evidence demonstrating David's involvement included: directing his family to send letters to Belford's acquaintances accusing Belford of sexual abuse; setting up the in-person court hearing that brought Belford to the courthouse where Thomas shot her; lying to probation officers about the need to attend the hearing in person; and traveling from Texas to Delaware in two vehicles that were filled with numerous weapons.

The evidence demonstrating Gonzalez's involvement included: spreading the false accusations of child abuse by creating online postings and YouTube videos, and sending defamatory emails and letters to Belford's acquaintances; preparing false polygraph reports about these accusations; recruiting third parties to surveil and report on Belford and the

18

children; providing Thomas with her temporary cell phone number and cleaning out his safe when he traveled to Delaware in 2011 and showed up at Belford's house; and filing numerous petitions for custody of the children beginning two days after Belford was killed. Thus, we conclude that the evidence was more than sufficient to support the conspiracy charges against David and Gonzalez.

As to the charged violation of § 2261A(2), the Government produced sufficient evidence that David and Gonzalez committed cyberstalking that resulted in Belford's death. Our review of the record demonstrates that the evidence shows that each of the defendants engaged in many more than the two requisite acts in furtherance of their long campaign to defame and accuse Belford of sexual abuse of her children. The purpose of this campaign, and the acts committed in furtherance thereof, was to regain custody of the children by removing Belford — or causing her to remove herself — from the equation. The evidence discussed above was more than sufficient for the jury to determine that the accusations against Belford were false, and thus infer that the defendants continued making these accusations with the intent to harass or intimidate Belford.

The record also contains overwhelming evidence of the fear and emotional distress suffered by Belford and her children. This includes testimony by Belford's children about their awareness and fear of the defendants' conduct. The Government also produced evidence from numerous third parties to whom Belford had confided her fears of the defendants due to their conduct, including Belford's

19

discussions with her therapist about the emotional and psychological toll that the defendants' actions had on her.[7]

Finally, the Government produced sufficient evidence to prove that the defendants' conduct resulted in Belford's death, thus making them eligible for life sentences under § 2261(b)(1). As discussed more thoroughly below with regard to the jury instruction challenge, the District Court properly instructed the jury that the defendants could be responsible for Belford's death either because their actions were the actual and proximate cause of her death, or by way of co-conspirator liability, if she was killed by a co-conspirator acting in furtherance of the conspiracy. Our review of the record demonstrates that there is sufficient evidence to establish either theory of liability.

---

[7] We have reviewed the record and conclude that it also contains sufficient evidence to support the count brought only against David for interstate stalking under § 2261A(1). This includes the evidence that he initiated the court hearing in Delaware, to which he traveled from Texas, with his parents in two vehicles that were filled with numerous weapons. Together with the fact that he did not inform his probation officers that he could participate in the hearing by telephone to get permission to leave the state, this is sufficient to support an inference by the jury that he traveled in interstate commerce with "the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate" Belford. 18 U.S.C. § 2261A(1). The above-discussed evidence of emotional distress that satisfied the § 2261A(2) violation is also sufficient to satisfy the § 2261A(1) violation.

David's involvement in the stalking campaign, as well as his actions in setting up the court hearing and bringing Thomas to the courthouse where he then shot Belford, are sufficient to support an interference that he was the "but for" cause of Belford's death. And as discussed above, there is sufficient evidence to support the inference that he had the specific intent that Belford should die. See supra, note 7. As to Gonzalez, her involvement in the stalking campaign also demonstrates that she was a "but for" cause of Belford's death. Gonzalez's numerous communications with her family members indicate that it was reasonably foreseeable to her that Belford's murder at her family's hands might soon come to pass, and support an inference that she was the proximate cause of Belford's death. This evidence includes the correspondence from Thomas to Gonzales that the two drink to Belford's "final day" and the communication from David that Gonzalez should prepare herself to soon be managing four children. Further, Gonzalez was ready to — and did — petition for custody of the children almost immediately after Belford was killed.[8]

---

[8] Even if this evidence of the defendants' direct involvement in Belford's death were not sufficient, the jury's finding that their actions resulted in Belford's death is proper under co-conspirator liability. The doctrine of co-conspirator liability "permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy." United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001). Because there was sufficient evidence supporting the conspiracy conviction, there was also sufficient evidence supporting finding David and Gonzalez responsible for

For the foregoing reasons, the evidence produced at trial was more than sufficient to support the jury's verdict.

## B. Jury Instruction Challenges

The defendants raise two challenges to the District Court's jury instructions. They contend that the District Court (1) erred in not providing a specific unanimity instruction, and (2) erred in its construction of the "death results" instruction. Our "[r]eview of the legal standard enunciated in a jury instruction is plenary, but review of the wording of the instruction, i.e., the expression, is for abuse of discretion." United States v. Yeaman, 194 F.3d 442, 452 (3d Cir. 1999) (citation omitted). Because the defendants failed to object to the unanimity instructions or raise the specific unanimity instruction issue before the District Court, we review that issue for plain error. See United States v. Poulson, 871 F.3d 261, 270 (3d Cir. 2017). Under plain error review, we require the defendants to show that there is: (1) an error; (2) that is "clear

_____

Belford's death pursuant to co-conspirator liability. Thomas, who shot Belford, was a co-conspirator. As discussed above, the Government submitted sufficient evidence that the goal of the conspiracy was to obtain custody of the children by driving Belford out of the picture. Killing Belford would clearly be in furtherance of this goal. And the evidence before the jury, including the communications between Thomas and the other defendants, the detailed surveillance of Belford, and the amount of weapons brought with the Matusiewicz family to Delaware, in addition to the other evidence that has been discussed above, demonstrates that Thomas's murder of Belford was reasonably foreseeable to both David and Gonzalez. Thus, the requirements of co-conspirator liability are satisfied.

22

or obvious;" and (3) that "affected the appellants' substantial rights." United States v. Stinson, 734 F.3d 180, 184 (3d Cir. 2013) (citations omitted). "If those three prongs are satisfied, we have 'the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)).

### 1. Lack of a Specific Unanimity Instruction

The defendants argue that the District Court erred because it failed to give a specific unanimity instruction to inform the jury that it must unanimously agree on which specific acts the defendants committed. To prove cyberstalking under 18 U.S.C. § 2261A(2), the Government must, inter alia, establish that the defendant engaged in a course of conduct that placed a person in reasonable fear of death or serious bodily injury, or causes substantial emotional distress, either to that person or to a partner or immediate family member, "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate" that person. 18 U.S.C. § 2261A(2); Fullmer, 584 F.3d at 163. The defendants argue that the jury was required to be unanimous on which of the specific acts it found to be part of the defendants' course of conduct.

"It is well settled that a defendant in a federal criminal trial has a constitutional right to a unanimous verdict." Yeaman, 194 F.3d at 453. We have acknowledged that "[t]his includes the right to have the jury instructed that in order to convict, it must reach unanimous agreement on each element of the offense charged." Id. This is known as the "general

23

unanimity instruction." United States v. Beros, 833 F.2d 455, 460 (3d Cir. 1987). Typically, when an indictment alleges a number of different factual bases for the defendants' criminal liability, the general unanimity instruction ensures that the jury unanimously agrees on the factual basis for a conviction. Id. However, "this does not mean one has a right to insist on an instruction requiring unanimous agreement on the means by which each element is satisfied." Yeaman, 194 F.3d at 453. In the case where "a statute enumerates alternative routes for its violation, it may be less clear . . . whether these are mere means of committing a single offense (for which unanimity is not required) or whether these are independent elements of the crime (for which unanimity is required)." Id.

Here, the defendants contend that specific unanimity is required because the statute contains multiple alternative routes for its violations, which consist of distinct elements. In their briefing, the defendants identify two different portions of the statute which they argue consist of distinct elements requiring specific unanimity: (1) the two specific acts that must be proven to establish the course of conduct requirement, and (2) the mens rea requirement. The Government contends that these are no more than distinct means of committing cyberstalking, not elements. The defendants argue in the alternative that the uncertainty over whether these are elements or means creates the potential for jury confusion, which would also necessitate a more specific unanimity instruction. See Beros, 833 F.2d at 460 (observing that the general unanimity instruction can be insufficient "where the complexity of the case, or other factors, creates the potential that the jury will be confused"). The defendants thus contend that under Beros, the District Court was required to provide a more specific unanimity instruction. We disagree.

24

In <u>Beros</u>, we described a scenario in which the general unanimity instruction is not sufficient, concluding that

> When it appears . . . that there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice. To correct any potential confusion in such a case, the trial judge must augment the general instruction to ensure the jury understands its duty to unanimously agree to a particular set of facts.

<u>Id.</u> at 461 (alteration in original) (emphasis omitted) (quoting <u>United States v. Echeverry</u>, 698 F.2d 375 (9th Cir.), <u>modified</u>, 719 F.2d 974, 975 (9th Cir. 1983) (en banc)).

The indictment at issue in <u>Beros</u> advanced multiple different theories for how the defendant had violated the relevant statute. <u>Id.</u> at 460. There, the Government charged the defendant under a disjunctively worded statute, alleging that the defendant violated that statute by engaging in three separate and different acts. <u>Id.</u> We held that the district court abused its discretion in not specifically instructing the jury that it had to be unanimous as to at least one of the three acts committed. <u>Id.</u> at 460-63. We determined that "[w]hen the government chooses to prosecute under an indictment advancing multiple theories, it must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury." <u>Id.</u> at 462. We went on to specify that the Government "cannot rely on a composite theory of guilt, producing twelve

25

jurors who unanimously thought the defendant was guilty but who were not unanimous in their assessment of which act supported the verdict." Id.

Since Beros, we have reiterated that "the need for a specific unanimity instruction is the exception to the 'routine case' in which a 'general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability.'" United States v. Cusumano, 943 F.2d 305, 312 (3d Cir. 1991) (quoting Beros, 833 F.2d at 460). And, we have held that "[t]he Beros rule comes into play only when the circumstances are such that the jury is likely to be confused as to whether it is required to be unanimous on an essential element." Id. Thus, Beros applies where the Government advances different factual theories concerning the defendants' charged conduct, each of which could independently satisfy the elements of the crime. In such a situation, a specific unanimity instruction is needed to ensure that the jury agrees on which of a (or a set of) charged act(s) that the defendant committed constituted criminal behavior. For example, in Beros, the indictment alleged that defendant embezzled money from a pension fund of which he was a trustee. Beros, 833 F.2d at 458. One count of the indictment

> alleged three separate transactions of [his] criminal conduct: (1) the use of a Joint Council credit card to pay air fare for himself and his wife; (2) occupying a hotel suite that cost $160.00 per day rather than a single or double room which would cost no more than $60.00 per day; and (3) remaining in Florida for a couple of

26

additional days for personal reasons after the conclusion of the conference.

Id. at 461.

We held that a specific unanimity instruction was needed to ensure that the jury did not return a guilty verdict where all jurors agreed that the defendant engaged in criminal conduct, but some jurors thought that only the first transaction constituted criminal conduct, and others thought that only the second or third transactions constituted criminal conduct. Id. We reasoned that in such a scenario, "the jury would unanimously conclude that there was a mode or manner of violating the law, but there would be no unanimity as to the predicate act. Also, under such a scenario, any verdict would be defective because of the lack of real unanimity." Id. at 462. In contrast, we have held that a specific unanimity instruction is not needed, because the same potential for juror confusion does not exist, where "the government did not allege different sets of facts, and the only possible confusion arose from the disjunctive nature of the charge under the statute." Cusumano, 943 F.2d at 312. Applying Beros, we have since observed that "[w]e have never required that jurors be in complete agreement as to the collateral or underlying facts which relate to the manner in which the culpable conduct was undertaken." United States v. Jackson, 879 F.2d 85, 88 (3d Cir. 1989).

We hold that the District Court was not required to issue a specific unanimity instruction in this case. Neither the mens rea requirements of § 2261A(2) nor the individual acts which constituted the statute's "course of conduct" requirement constitute distinct elements of the offense. As to the mens rea requirement, we have held that different mental states in a

27

statute constitute <u>alternate</u> means and not alternate elements. <u>See</u> <u>United States v. Navarro</u>, 145 F.3d 580, 586 (3d Cir. 1998). In <u>Navarro</u>, we determined that "it is neither clear nor obvious that the three alternative mental states defined in § 1956[, the anti-money-laundering statute,] could not properly be treated as separate means of committing a single offense." <u>Id.</u> at 592. This conclusion followed from the Supreme Court's decision in <u>Schad v. Arizona</u>, 501 U.S. 624 (1991), which held that a specific unanimity instruction was not needed for a prosecution under "an Arizona statute which defined first-degree murder as being either (a) willful, deliberate, or premeditated, or (b) committed in the course of certain felonies," because those two alternatives were not separate elements but instead "alternative means of satisfying an element of an offense." <u>Navarro</u>, 145 F.3d at 586 (citing <u>Schad</u>, 501 U.S. at 628).

Here, the statute requires that the defendant act "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate." 18 U.S.C. § 2261A(2). Nothing in the text of the statute or any cases interpreting it indicates that it was intended to create separate offenses for stalking "with the intent to kill" as opposed to stalking "with the intent to . . . injure" or "with the intent to . . . harass." Instead, the statute requires that the defendant engage in "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose" that "places that person in reasonable fear of the death of or serious bodily injury" or causes that person "substantial emotional distress." <u>Id.</u> §§ 2261A(2), 2266. A defendant violates the statute if that conduct is engaged in with one of the aforementioned <u>mentes reae</u>. We have noted that "different means for committing an offense 'must reflect notions of equivalent blameworthiness or culpability.'" <u>Yeaman</u>, 194 F.3d at 454 n.6 (quoting <u>United</u>

28

States v. Edmonds, 80 F.3d 810, 820 (3d Cir. 1996)). The offense here stresses the effect that the defendant's conduct has on the victim. Thus, as long as that conduct was taken with an intent to cause the victim harm, the specific mental state does not make a difference to the defendant's culpability. This is evidenced by the fact that the statute sets forth different tiers of punishment based not on the mental state of the defendant, but on the harm suffered by the victim. See 18 U.S.C. § 2261(b).

The decisions of our sister Courts of Appeals interpreting § 2261A(2) support our view that the mens rea requirement constitutes alternate means as opposed to alternate elements of the offense. The Court of Appeals for the Fourth Circuit, for instance, has declined to parse the different mentes reae, and observed that "[i]t is an element of the crime that [the defendant] have intended harm to a particular victim." United States v. Shrader, 675 F.3d 300, 311 (4th Cir. 2012). The Court of Appeals for the Ninth Circuit has also treated the mens rea requirement as a single element in conducting its analysis of the statute. See United States v. Osinger, 753 F.3d 939, 947 (9th Cir. 2014).

A specific unanimity instruction was also not needed as to the course of conduct requirement. The jury is not required to agree on which specific acts were part of the stalking campaign. The statute defines the required "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). The defendants argue that because, to be convicted of cyberstalking, they must have committed two or more acts as part of the course of conduct, the jury needs to agree on the specifics of which acts were committed with the requisite criminal intent.

29

However, the two or more specific acts that constitute a course of conduct are not distinct elements of the offense. The crux of the course of conduct requirement is that the defendants have engaged in "a pattern of conduct," which "evidenc[es] a continuity of purpose." Id. § 2266(2). This language is significant. The focus is not on the individual acts as separate, distinct events, but instead on the purpose and scope of the defendants' pattern of stalking conduct as a whole. See United States v. Conlan, 786 F.3d 380, 386 (5th Cir. 2015) ("[T]he statute's intent requirement 'modifies the cumulative course of conduct as a whole,'" and avoids criminalizing otherwise innocent acts) (quoting Shrader, 675 F.3d at 311-12)). Nothing in the statute requires that the individual acts be criminal violations on their own. The statute does not require that a defendant commit multiple criminal acts to engage in a course of conduct. Instead, it is the pattern of conduct formed by the individual acts, undertaken with a continuity of purpose, that constitutes the criminal violation. As the Court of Appeals for the Fourth Circuit observed,

> While the statute does not impose a requirement that the government prove that each act was intended in isolation to cause serious distress or fear of bodily injury to the victim, the government is required to show that the totality of the defendant's conduct "evidenc[ed] a continuity of purpose" to achieve the criminal end.

Shrader, 675 F.3d at 311. The court then concluded that "[t]his statutory scheme reflects a clear understanding on the part of Congress that while severe emotional distress can of course be

30

the result of discrete traumatic acts, the persistent efforts of a disturbed harasser over a period of time . . . can be equally or even more injurious." Id. at 311-12. As a result, "[t]he cumulative effect of a course of stalking conduct may be greater than the sum of its individual parts." Id. at 312. The court thus rejected the intent and unanimity position that the defendants take here, because it held "[t]o read in a requirement that each act have its own specific intent element would undo the law's protection for victims whose anguish is the result of persistent or repetitive conduct on the part of a harasser." Id.

For the foregoing reasons, the District Court's failure to include a specific unanimity instructions was not an error, and the defendants are not entitled to relief under plain error review.

### 2. "Death Results" Instruction

The defendants next argue that the District Court erred in its construction of the special instruction it gave the jury to determine whether the defendants qualified for the "death of the victim results" sentencing enhancement. 18 U.S.C. § 2261(b)(1). The proper construction of this instruction was an issue of first impression for the District Court and remains one for us. The defendants concede that this instruction should be reviewed for plain error. Matusiewicz Br. 66, 75.

The District Court gave the following "death results" instruction as part of its "Special Interrogatory Regarding the Death of Christine Belford — Counts Three and Four" jury instruction:

31

A person's death "results" from an offense only if that offense caused, or brought about, that death. In determining whether the particular offenses charged in Counts 3 or 4 caused Christine Belford's death, you must affirmatively answer two questions. First, would Christine Belford's death have occurred as alleged in the Indictment in the absence of the particular offense? Stated differently, you should decide whether Ms. Belford would have died at the New Castle County Courthouse on February 11, 2013, but for the particular offense. Second, was Christine Belford's death the result of the particular offense in a real and meaningful way? This includes your consideration of whether her death was a reasonably foreseeable result of the particular offense and whether her death could be expected to follow as a natural consequence of the particular offense.

With regard to the special interrogatories for Counts Three and Four, if you found the Defendant guilty of conspiracy under Count One it is not necessary for you to find that a particular defendant's personal actions resulted in the death of Christine Belford. A defendant may be held accountable for the death of Christine Belford based on the legal rule that each member of a specific conspiracy is responsible for acts committed by the other members, as long as those acts were committed to help further or achieve the objective of the specific conspiracy and were reasonably foreseeable to the defendant

32

as a necessary or natural consequence of the agreement. In other words, under certain circumstances the act of one conspirator may be treated as the act of all. This means that all the conspirators may be held accountable for acts committed by any one or more of them, even though they did not all personally participate in that act themselves.

In order for you to answer "yes" to the jury interrogatories for Counts Three or Four based upon this legal rule, you must find that the Government proved beyond a reasonable doubt each of the following four (4) requirements with regard to the charge at issue:

First: That the defendant was a member of the conspiracy to commit the particular offense charged in Count One of the Indictment;

Second: That while the defendant was still a member of the conspiracy, one or more of the other members of the same conspiracy also committed the offense charged in Count Three or Count Four, by committing each of the elements of that offense as I explained those elements to you in these instructions, and his or her acts therein resulted in the death of Christine Belford according to the instructions I have just given you.

33

|  | However, the other member of the conspiracy need not have been found guilty of (or even charged with) the offense in question, as long as you find that the Government proved beyond a reasonable doubt that the other member committed the offense. |
|---|---|
| Third: | That the other member of the conspiracy committed this particular offense within the scope of the unlawful agreement and to help further or achieve the objectives of the specific conspiracy; and |
| Fourth: | That Ms. Belford's death was reasonably foreseeable to or reasonably anticipated by the defendant as a necessary or natural consequence of the unlawful agreement. |

The Government does not have to prove that the defendant specifically agreed or knew that Ms. Belford's death would result. However, the Government must prove that Ms. Belford's death was reasonably foreseeable to the defendant, as a member of the conspiracy, and within the scope of the agreement as the defendant understood it.

34

App. 5871-72.

The defendants contend that the District Court erred by giving this instruction. They contend that the instruction should have required that the jury find that there was an agreement among the defendants to cause Belford's death.[9] They also contend that under the instructions the District Court gave, the jury could not have found that the defendants caused Belford's death. The Government argues that this instruction properly set forth the two possible ways that the jury could find that the defendants' actions resulted in Belford's death. These theories of liability are that: (1) Belford's death resulted from the defendants' personal actions if the defendants' personal actions were the actual and proximate cause of Belford's death, or (2) the defendants are responsible for Belford's death under co-conspirator liability.

The District Court included both theories in its jury instruction and clearly distinguished between them. With respect to the first theory, that the defendants' personal actions were the actual and proximate cause of Belford's death, the District Court observed that its instruction held the jury to a higher standard than it believed the law required. See App. 61. Under this theory, the instruction required that the jurors find that each defendant's conduct was the actual cause of Belford's death and, in the context of the proximate cause question, that the death was "the result of the particular offense in a real and meaningful way," including whether it was "reasonably

---

[9] While the defendants contend that the District Court's instruction was erroneous, they do not articulate clearly a proposed alternative instruction. Instead, much of their argument retreads their sufficiency of the evidence challenge.

35

foreseeable" and "could be expected to follow as a natural consequence of the particular offense." App. 5871. The District Court observed that it included this language "to increase the government's burden by highlighting for the jury the need for there to exist a genuine nexus between the Defendants' conduct and the victim's death." App. 61. It explained that it required this heightened burden as to proximate cause, beyond what would be typically required for a proximate cause finding in tort law, as a "necessary safeguard" for the defendants' rights. App. 61.

Because the issue of how to define for the jury the proof required to establish that the defendants' conduct caused the victim's death, thus triggering the "death results" enhancement under § 2261(b)(1), is one of first impression, the District Court issued a supplemental opinion explaining its reasoning for fashioning the jury instruction the way it did. See App. 56-61. The District Court explained that it looked to the cases defining "death results" language in other statutes, namely Burrage v. United States, 571 U.S. 204 (2014) and Paroline v. United States, 572 U.S. 434 (2014), to form the basis for its causation instruction to the jury. The District Court then explained why it viewed the proximate cause requirement as requiring a heightened standard of proof here compared to that required under general tort law.

We hold that the District Court did not err in crafting the jury instruction for the "death results" enhancement. The District Court properly followed Burrage and Paroline. In Burrage, the Supreme Court held that a "death results" sentencing enhancement in the Controlled Substances Act "is an element that must be submitted to the jury and found beyond a reasonable doubt," because it "increased the minimum and

36

maximum sentences to which [the defendant] was exposed." Burrage, 571 U.S. at 210. The Court noted that such language meant that "a defendant generally may not be convicted unless his conduct is 'both (1) the actual cause, and (2) the 'legal' cause (often called the 'proximate cause') of the result.'" Id. (quoting 1 W. LaFave, Substantive Criminal Law § 6.4(a), 464-66 (2d ed. 2003)). The Court continued on to discuss the "actual cause" standard, determining that it "requires proof 'that the harm would not have occurred' in the absence of— that is, but for—the defendant's conduct." Id. at 211 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 347-48 (2013)). The Court did not discuss the proximate cause requirement, because it held that the actual cause requirement had not been satisfied where there was "no evidence" that the conduct at issue "was an independently sufficient cause of . . . death." Id. at 190.

The Court did address in detail the concept of proximate cause in Paroline. It observed that "a requirement of proximate cause is more restrictive than a requirement of factual cause alone," and that "proximate cause forecloses liability in situations where the causal link between conduct and result is so attenuated that the so-called consequence is more akin to mere fortuity." 572 U.S. at 446, 448. The Court struggled to define proximate cause, noting that it "defies easy summary" and "is 'a flexible concept.'" Id. at 444 (quoting Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654 (2008)). It determined that "to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." Id. The Court observed that the proximate cause analysis in criminal and tort law "is parallel in many instances." Id. In its discussion, the Court noted that proximate cause is typically explained "in terms of

foreseeability or the scope of the risk created by the predicate conduct." Id. at 445.

We hold that the District Court did not erroneously configure the portion of the "death results" instruction as to the direct theory of liability. The "actual cause" part of the District Court's instruction appropriately tracks the "but for" causation requirement of Burrage. 571 U.S. at 211. And the District Court's instruction on proximate cause required even a more stringent finding than that discussed by the Supreme Court in Paroline. Not only did the District Court require that the jury find Belford's "death was a reasonably foreseeable result of the particular offense," as is traditionally considered the proximate cause requirement, but also the District Court went further, requiring that the death result from the offense "in a real and meaningful way" and as a "natural consequence." App. 5871. The defendants have pointed to no authority that such a standard is insufficient to satisfy the proximate cause requirement. Thus, if anything, the District Court's instruction on proximate cause provided more protection for the defendants' rights than necessary under Supreme Court precedent. Accordingly, it was certainly not plain error for the District Court to give this instruction.

Additionally, the District Court also properly instructed the jury that they could find the defendants liable under an alternative, co-conspirator theory of liability. The District Court's instruction on when conspirators can be held liable for the actions of their co-conspirators was not plain error as it followed this Court's model jury instructions and precedent. See Third Circuit's Model Criminal Jury Instruction § 7.03 "Responsibility For Substantive Offenses Committed By Co-Conspirators (*Pinkerton* Liability)." We have held that "a

38

participant in a conspiracy is liable for the reasonably foreseeable acts of his coconspirators in furtherance of the conspiracy." United States v. Cross, 308 F.3d 308, 311 n.4 (3d Cir. 2002) (citing Pinkerton v. United States, 328 U.S. 640, 647 (1946)). This is known as the Pinkerton theory of liability. This doctrine "permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy." United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001). Accordingly, we hold that the District Court did not plainly err in following our precedent and model jury instructions when instructing the jury that it could rely on co-conspirator liability.

## C. Substantive Challenges to the Prosecution of the Case

### 1. First Amendment

Gonzalez argues that the indictment should have been dismissed because it violated the First Amendment. She brings an as-applied challenge to the cyberstalking statute. David joins Gonzalez's First Amendment arguments, but does not provide any separate discussion for an as-applied challenge as to his conduct. We review constitutional claims de novo. Garcia v. Att'y Gen, 665 F.3d 496, 502 (3d Cir. 2011).

Gonzalez argues that she cannot be convicted for violating § 2261A(2) because her conduct constituted protected speech under the First Amendment. She argues that her speech — which consisted of, inter alia, sending emails to her co-defendants, sending correspondence to Belford and her

children, contacting third parties, posting polygraph results and videos with accompanying commentary — was protected because she was expressing her sincerely held belief about Belford. She contends that her speech about Belford constituted an opinion, and as such receives complete protection under the First Amendment.[10] The Government

---

[10] Gonzalez also briefly includes a vagueness and overbreadth challenge to the statute as a whole, which she supports with virtually no analysis. These challenges fail. "In the First Amendment context . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" United States v. Stevens, 559 U.S. 460, 473 (2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008)). The Supreme Court has counseled that an overbreadth challenge is unlikely to "succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Virginia v. Hicks, 539 U.S. 113, 124 (2003). Furthermore, a statute is unconstitutionally vague only if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). To this end, we consider whether a statute's prohibitions "are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 579 (1973).

Section 2261A is neither overbroad nor unconstitutionally vague. It is not targeted at "speech or to

40

argues that this statute does not violate the First Amendment because it prohibits conduct, and any speech included in its breadth falls into an exception that does not warrant First Amendment protection.

The First Amendment "permit[s] restrictions upon the content of speech in a few limited areas." United States v. Stevens, 559 U.S. 460, 468 (2010) (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 382-83 (1992)). The Supreme Court has identified certain "well-defined and narrowly limited

conduct necessarily associated with speech," but with harassing and intimidating conduct that is unprotected by the First Amendment. Thus, because "a substantial number of the statute's applications" are not unconstitutional, it is not overbroad. Wash. State Grange, 552 U.S. at 449 n.6. And, it is not unconstitutionally vague, as it uses readily understandable terms such as "harass" and "intimidate," and requires that a defendant intend to cause victims serious harm and in fact cause a reasonable fear of death or serious bodily injury. Thus, an "ordinary person exercising ordinary common sense can sufficiently understand and comply with" the terms of this statute. U.S. Civil Serv. Comm'n, 413 U.S. at 579. Every one of our sister Courts of Appeals to consider similar overbreadth and vagueness challenges to § 2261A has rejected them. See United States v. Conlan, 786 F.3d 380, 385-86 (5th Cir. 2015); United States v. Osinger, 753 F.3d 939, 944-45 (9th Cir. 2014); United States v. Sayer, 748 F.3d 425, 436 (1st Cir. 2014); United States v. Petrovic, 701 F.3d 849, 854-56 (8th Cir. 2012); United States v. Shrader, 675 F.3d 300, 310 (4th Cir. 2012); United States v. Bowker, 372 F.3d 365, 379-83 (6th Cir. 2004). The defendants have provided no authority or analysis to the contrary.

41

classes of speech" that can be proscribed without implicating the First Amendment. Id. at 468-69 (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)). Relevant here, these classes of speech include (1) "defamation" and (2) "speech integral to criminal conduct." Id. at 468.

As to the first class of speech, the Supreme Court has held that defamatory statements are not protected by the First Amendment, reasoning that "[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." Beauharnais v. Illinois, 343 U.S. 250, 257 (1952) (quoting Cantwell v. Connecticut, 310 U.S. 296, 309 (1940)). And while statements of personal opinion are protected under the First Amendment, see Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974), "there is no constitutional value in false statements of fact," id. at 340. False statements of fact are not protected because "[n]either the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." Id. (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1970)).

As to the second class of speech, the Supreme Court has long maintained that speech integral to engaging in criminal conduct does not warrant First Amendment protection. See Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949). Thus, "[s]pecific criminal acts are not protected speech even if speech is the means for their commission." Packingham v. North Carolina, 137 S. Ct. 1730, 1737 (2017). In Giboney, the Court held that enjoining otherwise lawful picketing activities did not violate the First Amendment where the sole purpose of that picketing was to force a company to enter an unlawful

42

agreement in violation of Missouri's criminal antitrust laws. 336 U.S. at 501-02. The Court reasoned that such a restraint was justified because the otherwise lawful expressive activity was done for "the sole immediate purpose of continuing a violation of law." Id. at 501. The Court "reject[ed] the contention" that "the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." Id. at 498. The Court reasoned that "[s]uch an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against . . . agreements and conspiracies deemed injurious to society." Id. at 502.

We hold that 18 U.S.C. § 2261A does not violate the First Amendment as applied to Gonzalez, because she did not engage in protected speech. Her conduct was both defamatory and speech integral to criminal conduct. The defendants published false information about Belford on the internet and to third parties. Gonzalez, acting along with the other members of her family as a member of the conspiracy, defamed Belford by falsely labeling her as a mentally unfit abuser who sexually molested her own children. In addition, the members of the conspiracy defamed the children by falsely labeling them as victims of their mother's sexual abuse. There is overwhelming, uncontradicted evidence that the accusations that Belford sexually molested and abused her children were false.[11] Falsely accusing Belford of sexual assault is

---

[11] This evidence includes: (1) the testimony of L.M.1, the child who was alleged to be abused, denying any abuse occurred; (2) medical testimony corroborating L.M.1's denial of abuse; (3) materially inconsistent statements by the

43

unquestionably defamatory and not protected by the First Amendment. See Beauharnais, 343 U.S. at 257 ("[I]t is libelous falsely to charge another with being a rapist."). That Gonzalez claims to have sincerely held this belief, in light of the overwhelming evidence to the contrary, does not transform such a statement of fact into an opinion. Id. As "there is no constitutional value in false statements of fact," Gonzalez's speech on this ground does not warrant First Amendment protection. Gertz, 418 U.S. at 340.

Even if it were not defamatory, this speech is still unprotected as it falls squarely into the "speech integral to criminal conduct" exception. The defendants' speech served no legitimate purpose other than to harass and intimidate Belford, conduct that is illegal under § 2261A. Thus, the speech was that which had a "sole immediate purpose of continuing a violation of law." Giboney, 366 U.S. at 501. As discussed above, the evidence produced at trial sufficiently demonstrated that the defendants' conduct was part of a course of conduct targeted at Belford, intended to cause her distress and to obtain custody of her children. Thus, Gonzalez's internet postings and letters sent to Belford, the children, and third parties were actions that were integral to the course of conduct and the illegal purpose of the criminal cyberstalking conspiracy. As such, this conduct is not protected by the First Amendment.

---

defendants regarding their claims of abuse; (4) the fact that the no claims of abuse were made until well after the kidnapping charges were brought; (5) testimony from Belford's mental health providers; and (6) the analysis and conclusions found in the order of the Delaware Family Court terminating David's parental rights and his family's familial rights.

Our decision is in accord with those of our sister Courts of Appeals that have had the opportunity to consider First Amendment challenges to § 2261A. See, e.g., United States v. Conlan, 786 F.3d 380, 386 (5th Cir. 2015); United States v. Osinger, 753 F.3d 939, 947 (9th Cir. 2014); United States v. Sayer, 748 F.3d 425, 434 (1st Cir. 2014); United States v. Petrovic, 701 F.3d 849, 856 (8th Cir. 2012); United States v. Bowker, 372 F.3d 365, 379 (6th Cir. 2004), judgment vacated on other grounds, 543 U.S. 1182 (2005), reinstated in relevant part, 125 Fed. App'x 701 (6th Cir. 2005).

In Petrovic, the Court of Appeals for the Eighth Circuit held that the defendant's conduct, including making highly offensive online communications, "may be proscribed consistent with the First Amendment." Petrovic, 701 F.3d at 856. There, the defendant had created a website through which he disseminated sexually explicit images and false statements about his ex-wife. Id. at 852. He also sent mailings to third parties who knew the victim, including her family and co-workers, which contained similar information. Id. Based on these facts, the court concluded that these communications "were integral to this criminal conduct as they constituted the means of carrying out his extortionate threats." Id. at 855. The court reached its conclusion due to the fact that "[s]ection 2261A(2)(A) is directed toward 'course[s] of conduct,' not speech, and the conduct it proscribes is not 'necessarily associated with speech.'" Id. at 856 (citation omitted). This is "[b]ecause the statute requires both malicious intent on the part of the defendant and substantial harm to the victim." Id.

In Sayer, the Court of Appeals for the First Circuit rejected a First Amendment challenge to a conviction under

45

§ 2261A(2)(A). 748 F.3d at 435. There, the defendant "creat[ed] false online advertisements and accounts in [the victim's] name [and] impersonat[ed the victim] on the internet . . . which deceptively enticed men to [the victim's] home." Id. at 434. The court concluded that "[t]o the extent his course of conduct targeting [the victim] involved speech at all, his speech is not protected," because "it served only to implement [his] criminal purpose." Id. The court went on to observe that by prohibiting "a course of conduct done with 'intent to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate, or cause substantial emotional distress,'" the statute "clearly targets conduct performed with serious criminal intent, not just speech that happens to cause annoyance or insult." Id. at 435 (quoting 18 U.S.C. § 2261A(2)).

In Osinger, the Court of Appeals for the Ninth Circuit reached a similar conclusion. There, the defendant sent "threatening text messages" to the victim and "designed a false Facebook page and sent emails to [her] co-workers containing nude photographs of [her]." 753 F.3d at 947. The court held that "[a]ny expressive aspects of [the defendant's] speech were not protected under the First Amendment because they were 'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress to [the victim]." Id. This was because the defendant was engaged in a course of conduct with the intent to harass or intimidate the victim. Id.

In Conlan, the Court of Appeals for the Fifth Circuit similarly concluded that "§ 2261A does not criminalize constitutionally protected free expression." 786 F.3d at 386. There, the defendant conducted a "year-long campaign of

46

escalating sexual innuendo, threats of physical violence, and unwanted contacts with [the victims'] family, friends, and colleagues, culminating in an interstate trip to his victims' house." Id. The court concluded that because "one must both intend to cause victims serious harm and in fact cause a reasonable fear of death or serious bodily injury" to violate the statute, it criminalized conduct and not free expression protected by the Constitution. Id.

Each of these decisions supports our holding today. Here, what makes the defendants' conduct violative of § 2261A(2) is not that they simply made statements expressing their beliefs about Belford, but that these statements were sent to Belford, the children, and third parties as part of an extensive, and successful, campaign to threaten, intimidate, and harass Belford. As our sister Courts of Appeals have concluded, it is the intent with which the defendants' engaged in this conduct, and the effect this conduct had on the victims, that makes what the defendants did a criminal violation. See Conlan, 786 F.3d at 386; Osinger, 753 F.3d at 947; Sayer, 748 F.3d at 435; Petrovic, 701 F.3d at 856. Accordingly, we reject the defendants' First Amendment challenge, and will affirm the District Court's decision to decline to dismiss the case on First Amendment grounds. The defendants' convictions do not violate the First Amendment.

## 2. Venue in Delaware

The defendants also argue that the District Court did not have "jurisdiction" to preside over the case. This argument is based on the defendants' interpretation of an order from the district court judge first assigned to the case, Judge Gregory M. Sleet, which they claim transferred the case out of the district.

47

The defendants contend that because he then recused himself, Judge Sleet was not permitted to enter a later clarifying order specifying that he did not transfer the case in this earlier order. They also argue that under the law-of-the-case doctrine, Judge McHugh, who took over the case after all of the district judges in the District of Delaware were recused, was bound to transfer the case out of the district. We review a judge's decision to reconsider his or her predecessor's ruling for an abuse of discretion. Fagan v. City of Vineland, 22 F.3d 1283, 1290 (3d Cir. 1994).

On September 12, 2014, Judge Sleet granted the defendants' motions for recusal, and recused himself from the case. Gonzalez's recusal motion was titled "Motion for Transfer and Recusal," and it requested a transfer of venue in addition to Judge Sleet's recusal. App. 16-23. The memorandum opinion accompanying Judge Sleet's order did not mention venue transfer. See id. The defendants argued that in addition to recusing himself, and all of the district judges in the District of Delaware, from the case, this order also transferred venue out of the District of Delaware. The Government disputed that characterization, and the parties then briefed the issue. On December 4, 2014, Judge Sleet issued an amended order that clarified that the Motion for Transfer and Recusal was granted in part, as to recusal only. App. 24. Nonetheless, the defendants filed motions to enforce Judge Sleet's transfer of venue. On March 10, 2015, Judge McHugh issued an order, ruling on those motions to enforce, and finding that Judge Sleet never granted the venue-transfer portion of the motion to transfer. App. 25-29. The defendants argue that this was an abuse of discretion. We disagree.

48

Judge Sleet's memorandum opinion clearly did not transfer venue, because venue transfer is not mentioned in the opinion. Because venue transfer was not discussed, Judge Sleet thus also did not identify to what judicial district venue the case was purportedly transferred or the reasons for that transfer. Without such explanations, venue could not properly be transferred. See In re United States, 273 F.3d 380, 387 (3d Cir. 2001) (requiring the district court to provide "a statement of reasons for granting the motion to transfer so that the appellate court has a basis to determine whether the district court soundly exercised its discretion and considered the appropriate factors" that contains "a sufficient explanation of the factors considered, the weight accorded them, and the balancing performed"). That this order did not and was never intended to transfer venue is confirmed by the amended order, which clarified that the prior order granted the motion only as to recusal and not as to venue transfer. We have held that "[t]he law of the case doctrine does not preclude a trial judge from clarifying or correcting an earlier, ambiguous ruling." Fagan, 22 F.3d at 1290. That is what Judge Sleet did here. Thus, Judge McHugh did not abuse his discretion by failing to transfer venue, because Judge Sleet's opinions make clear that venue was never transferred.

## D. Evidentiary Challenges

We exercise plenary review over the District Court's interpretation of the Federal Rules of Evidence. United States v. Duka, 671 F.3d 329, 348 (3d Cir. 2011). We review the District Court's application of the Rules and its decisions to admit or exclude evidence for abuse of discretion. Id. The District Court abuses its discretion if its analysis and conclusions are "arbitrary or irrational," or if its "decision

49

'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'" United States v. Schneider, 801 F.3d 186, 198 (3d Cir. 2015) (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 165-66 (3d Cir. 2001), and United States v. Universal Rehab. Servs. (PA), Inc., 205 F.3d 657, 665 (3d Cir. 2000) (en banc)).

### 1. Family Court Opinion

The defendants argue that the District Court erred by admitting into evidence the August 18, 2011 TPR Order from the Delaware Family Court. See App. 7827-68 (Gov. Ex. 308). By way of the TPR Order, the Delaware Family Court terminated David's parental rights, as well as the familial rights of his sister, Gonzalez, and their parents, with respect to David's children. The defendants argue that the TPR Order should have been excluded pursuant to Federal Rule of Evidence 403 because any probative value that it provided was substantially outweighed by the risk of unfair prejudice. They contend that factual findings as well as the statements about David contained in the TPR Order could have prejudiced the jury, since these statements were made by a judge. Further, they assert that introducing the findings of a judge would prejudice the jury because they would be likely to defer to these findings and not reach an independent verdict. The defendants also argue that the TPR Order constituted improper character evidence because it painted David as a liar and manipulator and was evidence of his prior bad acts which should not have been admissible pursuant to Federal Rule of Evidence 404(b).

The defendants filed a motion in limine to have the TPR Order excluded pursuant to Rules 403 and 404(b). The District

50

Court denied the motion, and admitted the TPR Order as relevant to the defendants' "state of mind and motive in continuing to make allegations against" Belford and as to their motive for engaging in the stalking. App. 51. The court admitted the TPR Order with a cautionary instruction. App. 51. It also further explained its ruling from the bench, after defense counsel again objected to the TPR Order being sent to the jury. App. 5753-54. The District Court made redactions to the TPR Order that were "carefully considered to remove from the jury's consideration the evidence that would really be prejudicial." App. 5753. The court also observed that the risk of prejudice was lessened by the fact that most of the witnesses who testified during the TPR hearing also testified at trial, and that the one who did not, Dr. Orlov, was available to be called by the defense, who chose not to do so.

The District Court gave multiple cautionary instructions. The first was immediately after the TPR Order was admitted into evidence and discussed by the Government's witness. See App. 2153-54. The court instructed that the TPR Order, which included the Family Court's findings that David's accusations of abuse by the children's mother were false, "does not definitively conclude that no abuse took place because that issue is in front of the Court here." App. 2153. The District Court went on to explain that "what you just heard about what the Family Court held might be considered as relevant to potentially a motive for future things that occurred including the stalking that the Government alleges occurred." App. 2153-54. The court also explained that the findings "are not automatically binding on you" and should be considered in light of all the evidence that the jury hears. App. 2154.

51

The District Court provided a second cautionary instruction during the recitation of jury instructions. It cautioned the jury that

> [t]hese materials were allowed into evidence to provide you with background for the offenses charged here. You may consider the findings made in Family Court in determining the defendant's state of mind, including knowledge, intent and motive with respect to the offenses charged in this indictment.
>
> You should not, however, conclude simply because the Family Court made certain factual findings that you are bound by those findings. As I've told you it is your duty to decide the fact from the evidence you've heard and seen in court during this trial. That is your job and yours only.

App. 5655.

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 403 "creates a presumption of admissibility." United States v. Claxton, 766 F.3d 280, 302 (3d Cir. 2014). In considering a challenge under Rule 403, "the trial court 'must appraise the genuine need for the challenged evidence and balance that necessity against the risk of prejudice to the defendant.'" Gov't of V.I. v. Archibald, 987 F.2d 180, 186 (3d

52

Cir. 1993) (internal quotations omitted) (quoting United States v. Blyden, 964 F.2d 1375, 1378 (3d Cir. 1992)).

Typically, "we exercise great restraint in reviewing a district court's ruling on the admissibility of evidence under Rule 403." Id. However, we do not defer to the district court where "the trial judge fails to perform the required balancing and to explain the grounds for denying a Rule 403 objection." Id. Where, as here, a district court applies Rule 403 to "determine the admissibility of Rule 404(b) evidence," the district court "must undertake some analysis, i.e., provide 'meaningful balancing.'" United States v. Repak, 852 F.3d 230, 246 (3d Cir. 2017) (quoting United States v. Caldwell, 760 F.3d 267, 283 (3d Cir. 2014)).

The defendants contend that the admissibility of the TPR Order should be subject to plenary review, because the District Court did not sufficiently explain the reasoning of its Rule 403 ruling. We disagree. The District Court properly engaged in the requisite balancing and "articulate[d] . . . a rational explanation" for its ruling. United States v. Sampson, 980 F.2d 883, 889 (3d Cir. 1992). The District Court in fact issued a written ruling on the admissibility of the TPR Order, which noted the relevance of the evidence and acknowledged that a cautionary instruction was needed to address the concerns raised by the defendants. See App. 51. Additionally, the District Court gave further reasons for its ruling from the bench. App. 5753-54. These explanations warrant deference as they far exceed the "bare recitation of Rule 403" that we have held is insufficient to warrant deference. See, e.g., Repak, 852 F.3d at 246. The District Court explained why the TPR Order was relevant, observed that its prejudicial effect was mitigated by the redactions as well as the fact that the findings

53

in the TPR Order were based on the testimony of witnesses who either testified or were available to testify at trial, and only admitted the TPR order for a limited purpose under Rule 404(b),[12] with the appropriate limiting instructions. Accordingly, we will review the Rule 403 ruling for abuse of discretion.

The District Court did not abuse its discretion in admitting the TPR Order. The TPR Order was highly relevant and was a key piece of evidence in the case as it was the Government's argument that the TPR Order was one of the main motivating factors that spurred the killing of Belford. The Government argued that David was particularly angered by the specific language used in the TPR Order. The Government, in fact, introduced a version of the TPR Order annotated with the defendants' handwritten notes as evidence of the effect that it had on them. See App. 7323. Further, this was used as evidence that the defendants believed the Delaware Family Court had let them down, and the Government argued that the detailed examination and rejection of the defendants' claims that the children were abused contained in the TPR Order rebuts the defendants' central defense in this case that they were not intending to harass Belford, but were instead just attempting to raise awareness for their claims of abuse and have them be heard. The District Court did not

---

[12] Rule 404(b) permits otherwise inadmissible character evidence to be admitted if it is used not to show a person's character, but instead for certain limited other purposes. See Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

54

abuse its discretion in admitting the TPR Order as highly relevant to the Government's case.

The prejudicial effects about which the defendants complain were mitigated by the cautionary instructions that the District Court gave to the jury. "[W]e presume that the jury will follow a curative instruction unless there is an 'overwhelming probability' that the jury will be unable to follow it and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." United States v. Newby, 11 F.3d 1143, 1147 (3d Cir. 1993) (internal quotation marks and citations omitted) (quoting Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)). We have ruled that the provision of a limiting instruction can alleviate the potential prejudice of evidence admitted over a Rule 403 objection. See, e.g., Repak, 852 F.3d at 247 ("[T]he District Court provided a limiting instruction, mitigating any concern that the jury would have used this evidence to draw a propensity inference."); United States v. Sriyuth, 98 F.3d 739, 748 (3d Cir. 1996) ("[T]he risk of unfair prejudice was minimized by the district court's instruction to the jury on the limited use of the sexual assault evidence."). The District Court gave two thorough curative instructions, in addition to redacting the most prejudicial parts of the TPR Order. The jury was expressly instructed that it was not bound by anything said in TPR Order and that it was to use it in considering the defendants' state of mind in committing the stalking offenses, and not for other impermissible purposes.[13] The curative

---

[13] Any potential prejudice from the TPR Order was further limited by the fact that, during closing arguments, the Government incorporated the cautionary instruction and qualified its arguments to explicitly note that the TPR Order was nonbinding. See App. 5442, 5593.

55

instructions here were sufficient to ameliorate the alleged unfair prejudice of which the defendants complain.

Alternatively, the defendants argue that the TPR Order was unduly prejudicial because it was issued by a court and the jury would feel bound to follow the finding of a judge, even with the limiting instruction. They argue that we should follow the Court of Appeals for the Ninth Circuit's opinion in United States v. Sine, in which that court observed "that factual testimony from a judge unduly can affect a jury" and that "jurors are likely to defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves." 493 F.3d 1021, 1033 (9th Cir. 2007). However, Sine is distinguishable. There, the government chose to present the factual findings from a prior civil case in which the defendant was involved in lieu of other evidence to prove those same facts at trial, and sought to rely on the fact that these factual findings were found by a judge, as a method of reinforcing the truth of the findings. Id. at 1035. The court held that it was improper for the government to attempt to usurp the jury's role as a factfinder in this way, and that the admission of these findings in lieu of the direct evidence constituted inadmissible hearsay. Id. at 1033, 1036. As discussed above, none of these concerns are present here, where the Government did not attempt to present the TPR Order for the truth of the factual findings, presented the testimony of the witnesses from the TPR hearing in its case, and itself stressed the Court's limiting instruction.

In sum, in light of the limiting instruction and the redactions, we hold that the District Court did not abuse its discretion in admitting the TPR Order.

56

## 2.  Belford's Therapy Tapes and Emails

The defendants next argue that the District Court abused its discretion in admitting Belford's statements to her therapist as part of her therapy sessions as well as emails Belford sent to her neighbors and colleagues.  The defendants argue that these statements are hearsay, and they were not properly admitted under any hearsay exception, such as Rules 803(3) and 803(4).  The defendants also argue that the admission of this evidence violated their rights under the Confrontation Clause.

The defendants objected at trial to the admission of this evidence.  Therefore, they contend that the abuse of discretion standard should be applied.  The Government argues that although this evidence was objected to, the defendants did not raise the same arguments as to its inadmissibility that they now raise, and thus we should review the admissibility of this evidence for plain error.  We need not resolve this dispute, because even under the more deferential abuse of discretion standard, the District Court properly admitted this evidence.

### a.  Therapy Sessions

The defendants first object to the admission of portions of recordings taken of Belford's sixteen therapy sessions to treat her anxiety and depression with Dawn Edgar, her therapist.  Edgar testified at trial, and these recordings were admitted through her testimony as evidence of Belford's state of mind.  The Government contends that they are admissible under two separate hearsay exceptions:  (1) as evidence of the declarant's state of mind, and (2) as a statement made for purposes of medical diagnosis or treatment.  Fed. R. Evid.

803(3) & (4). Rule 803(4) provides a hearsay exception for a "Statement Made for Medical Diagnosis or Treatment," which is defined as follows: "A statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4).

The defendants argue that Belford's statements to her therapist are not covered by Rule 803(4), because this exception should not apply to statements made to mental health professionals. They contend that statements made to mental health professionals do not exhibit the same indicia of reliability as do statements made to other medical professionals. The defendants claim that these statements are unreliable because the issue of the truth of a patient's statements regarding his or her mental condition is not as relevant for mental health professionals as it is for physical health doctors. As a result, the defendants argue that the statements were not made for "medical diagnosis or treatment," and thus do not qualify for the Rule 803(4) exception.

We disagree. We have not previously decided whether Rule 803(4) covers statements made to a mental health professional, rather than to a physician. However, the plain text of the Rule does not limit its application to statements made to a physician. Rule 803(4) focuses on the purpose for which the statement is made, not on the identity of the recipient. The advisory committee note to Rule 803(4) makes clear that statements made to a broad category of individuals other than physicians are covered by the exception, such as those made to "hospital attendants, ambulance drivers, or even members of the family." Fed. R. Evid. 803 advisory committee

note to paragraph (4). There is no indication from Rule 803(4) or its accompanying advisory committee notes that it should not extend to statements made to mental health professionals. The defendants have provided no persuasive authority in support of their position. If Rule 803(4) extends to cover statements made to non-medical persons such as family members, it logically also covers statements made to other medical professionals, including those who specialize in mental health. Accordingly, we hold that the exception in Rule 803(4) applies to statements made to therapists and mental health professionals.

The decisions of our sister Courts of Appeals support this conclusion, as every Court of Appeals to consider this issue has determined that statements made to a mental health professional for purposes of diagnosis or treatment qualify under the hearsay exception in Rule 803(4). See, e.g., United States v. Kappell, 418 F.3d 550, 556 (6th Cir. 2005); Danaipour v. McLarey, 386 F.3d 289, 297 (1st Cir. 2004); United States v. Yellow, 18 F.3d 1438, 1442 (8th Cir. 1994); Morgan v. Foretich, 846 F.2d 941, 949 n.17 (4th Cir. 1988); United States v. Lechoco, 542 F.2d 84, 89 n.6 (D.C. Cir. 1976), abrogated on other grounds by In re Sealed Case, 352 F.3d 409 (D.C. Cir. 2003).

Belford made the statements in question to her therapist, who she was consulting for treatment of her anxiety and depression. Thus, these statements were made for "medical diagnosis or treatment." Fed. R. Evid. 803(4)(A). These statements concerned Belford's emotional state, including discussions of her anxiety and depression, as well as their cause. These types of statements are plainly within the confines of Rule 803(4)(B) as they are a description of

Belford's "past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4)(B). Accordingly, we hold that Belford's statements to her therapist were admissible pursuant to Rule 803(4).[14]

---

[14] In the alternative, the Government argues that these recordings are admissible pursuant to Rule 803(3), the state of mind exception. The District Court admitted them because it found that they qualified under Rule 803(3) to show Belford's emotional state, which was a necessary element of the charges. Rule 803(3) provides that:

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Belford's statements to her therapist consist of Belford's description of her emotional condition. As the District Court correctly observed, the recorded nature of the statements was relevant to showing Belford's state of mind because the tenor of her voice in the recordings provided strong evidence of her emotional condition at the time. These statements were admitted to show the effect that the defendants' stalking campaign had on Belford and her resulting emotional state, not for the truth of what she was saying. Belford's emotional condition and state of mind are directly relevant to the Government's burden to prove that the defendants' actions caused her substantial emotional distress. Accordingly, this

b. Emails

The second set of hearsay challenges that the defendants bring are to emails that Belford sent to third parties. These emails concerned Belford's emotional condition. The defendants argue that these emails were inadmissible because they contained more than just a description of Belford's emotional state, as they also contained explanations of the facts that were the cause of that emotional state. The defendants contend that under the Rule 803(3) hearsay state of mind exception, the hearsay statements cannot encompass the facts that create the relevant state of mind. The Government contends that these emails were not admitted to show the truth of the descriptions of the defendants' acts contained therein, but to demonstrate that Belford was aware of the acts. The Government also identifies the other admissible evidence at trial that established these acts by the defendants. Thus, it contends, any descriptions of the acts in Belford's emails would be harmless, because these acts were already before the jury. See Gov. Br. 120 n.66 (identifying the portions of the record where the acts described in the emails were also described by other witnesses).

We hold that the District Court properly admitted these emails under the Rule 803(3) state of mind exception. The emails offer Belford's descriptions of the defendants' acts in the context of how those acts affected her emotional state, fitting squarely within the state of mind exception. These emails demonstrate that Belford was aware of defendants' actions and that those actions were causing her emotional distress, which

evidence squarely fits within Rule 803(3) and are also admissible under that rule.

61

are both substantive elements of the cyberstalking offense that the Government was required to prove. See 18 U.S.C. § 2261A(2). Accordingly, these emails demonstrated Belford's "state of mind" and "emotional . . . condition," Fed. R. Evid. 803(3), and thus do not constitute hearsay. We hold that the District Court did not abuse its discretion in admitting this evidence under Rule 803(3).[15]

c. Confrontation Clause

The defendants also challenge the admission of all of Belford's statements at trial under the Confrontation Clause of the Sixth Amendment. They contend that their rights were violated by the admission of this evidence, which they contend constitutes testimony by Belford, because they were unable to cross-examine Belford at trial.

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall

---

[15] Additionally, these statements also qualify as non-hearsay under Rule 801(c) because the Government was not offering them for the truth of the matter asserted in those statements. See Fed. R. Evid. 801(c) advisory committee note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); see also United States v. Figueroa, 818 F.2d 1020, 1026 (1st Cir. 1987) ("Statements proffered to show something other than the accuracy of their contents—to show, say, the knowledge or state of mind of the declarant or one in conversation with him—are not considered hearsay." (citing VI Wigmore on Evidence § 1789 at 235 (3d ed. 1940))).

enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A "witness" is any individual who bears "testimony" against the defendant, and such "testimony" can be contained in any functional equivalent of a witness's in-court statements, such as affidavits or "pretrial statements that declarants would reasonably expect to be used prosecutorially." Crawford v. Washington, 541 U.S. 36, 51 (2004). To fall within the ambit of the Confrontation Clause, proposed evidence must constitute a "statement," and such a statement must contain testimonial hearsay, meaning that the statement was "a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact;' and . . . was made primarily for the purpose of 'prov[ing] past events potentially relevant to later criminal prosecution.'" United States v. Stimler, 864 F.3d 253, 272 (3d Cir. 2017) (alteration in original) (footnote omitted) (first quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009); then quoting Michigan v. Bryant, 562 U.S. 344, 361 (2011)). Examples of testimonial statements include "prior testimony" as well as "police interrogations." Crawford, 541 U.S. at 68.

The defendants contend that Belford's prior statements to her therapist as presented in the recordings were testimonial in nature. They argue that a therapy session "mimic[s]" the format of a law enforcement interview of a crime victim, because both scenarios are a "structured setting" that involves questioning. Gonzalez Br. 66. They also argue that the two are similar because both involve discussions of unlawful conduct.

We disagree. Belford's statements to her therapist are not testimonial in nature. As her therapist testified, the purpose of Belford's visits were to receive therapy to treat her anxiety

63

and depression.  The purpose of a visit to a therapist is not to create a record for a future criminal case.  As we discussed previously, these statements were not hearsay because they were made for the purposes of "medical diagnosis or treatment."  Fed. R. Evid. 803(4)(A).  Indeed, as the Supreme Court has observed, many of the hearsay exceptions, including Rule 803(4) "rest on the belief that certain statements are, by their nature, made for a purpose other than use in a prosecution and therefore should not be barred by hearsay prohibitions." Bryant, 562 U.S. at 362 n.9.  It is clear from the record that the purpose of Belford's visits to her therapist was not to create a record for a future prosecution that could be used as a substitute for trial testimony.  Accordingly, the admission of Belford's statements as evidence did not violate the Confrontation Clause.

### 3.  Testimony of FBI Case Agent

Next, the defendants assert that the District Court erred by permitting the FBI case agent to vouch for the strength of the Government's case.  On redirect examination of the case agent, the District Court permitted him to respond to the single question:  "in the course of your investigation into this matter, has anything occurred that has shaken your belief in your actions?"  App. 3696.  The case agent responded in the negative.  Id.  The District Court permitted this redirect question, pursuant to the Government's request, after counsel for co-defendant Lenore on cross-examination asked the case agent if he, "at any point in time," had any "doubts" about the defendants' involvement in Belford's death.  App. 3638. Counsel for the defendants David and Gonzalez did not object to this initial line of questioning by counsel for Lenore, but did object to the Government's question on redirect.  The District

Court overruled these objections, reasoning that counsel for Lenore had opened the door to this redirect question, and counsel for David and Gonzalez had implicitly consented to it by not objecting to this line of questioning at the time. Afterwards, the District Court then provided a limiting instruction, informing the jury that it had permitted the question in response to questions by defense counsel on cross-examination and directing the jury that they were to follow only their own assessment of the evidence.

We review for abuse of discretion "the District Court's ruling on a challenge to prosecutorial statements objected to at trial." United States v. Vitillo, 490 F.3d 314, 325 (3d Cir. 2007). And we review a "vouching issue for abuse of discretion and harmless error." Id. "Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998) (citing United States v. Lawn, 355 U.S. 339, 359 n.15 (1958)). To prevail on a vouching claim, a defendant must demonstrate that: "(1) the prosecutor [assured] the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." Id. at 187. We have observed that a "defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record." Id. Impermissible vouching can occur through the use of witness testimony. United States v. Berrios, 676 F.3d 118, 134 (3d Cir. 2012). However, "where the purported vouching is a 'reasonable response to allegations of [impropriety]' by the defense, it is not improper." Id.

65

(alteration in original) (quoting United States v. Weatherly, 525 F.3d 265, 272 (3d Cir. 2008)).

Here, the challenged statement of the FBI case agent did not constitute vouching. As the District Court acknowledged both in overruling the defense objections and in providing the limiting instruction to the jury, the challenged question was permitted only as a response to the earlier questions on cross-examination about any doubts the case agent might have had about the strength of the case. The Government's follow-up question was a "reasonable response" to these defense questions. Id.[16] Accordingly, we hold that the District Court did not abuse its discretion by permitting this question.

### 4. Exclusion of Polygraph Rebuttal Evidence

The defendants next argue that the District Court committed reversible error by preventing Gonzalez from introducing the results of a polygraph examination as rebuttal evidence. They contend that this violated her right to an opportunity to present a meaningful defense under the Sixth and Fourteenth Amendments. They argue that the polygraph rebuttal evidence should not have been excluded because it was relevant, because the polygraph results are admissible under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and

---

[16] Because we hold that this question was permissible as a "reasonable response" to the questions asked by defense counsel, we need not decide whether this question and response even constitutes vouching due to the fact that neither the prosecuting attorney nor the case agent gave a personal assurance about the credibility of any witness. See Walker, 155 F.3d at 184.

because there is no per se rule excluding polygraph results in this Circuit.  See United States v. Lee, 315 F.3d 206, 214 (3d Cir. 2003).  The defendants contend that this evidence was necessary to rebut the prosecution's challenges to both Gonzalez's veracity and the veracity of statements made in another polygraph examination, which was a key part of the defendants' defamation campaign against Belford.  Finally, they contend that the exclusion of this evidence unfairly prejudiced Gonzalez because it hindered her ability to rebut the Government's assertions that certain statements she made as part of her harassment campaign were false and defamatory.

The District Court provided a supplemental opinion in which it explained its decision to exclude this rebuttal polygraph evidence.  See App. 62-73.  The District Court explained that it could have excluded the evidence on procedural grounds because the defendants did not timely or properly disclose the experts or summaries of the expert reports of those persons who administered this polygraph examination, and previously had informed the Government that they would not be seeking to admit this evidence.  However, the District Court instead chose to exclude this evidence on substantive grounds, because it did not find the polygraph results evidence to be reliable, but rather found that the defendants improperly sought to offer it as direct evidence of the defendants' guilt or innocence.  The District Court looked to recent scientific evidence on the reliability of polygraphs examinations, and determined that the scientific consensus reinforced doubts about their reliability.

In considering the constitutionality of a rule that operated as a per se exclusion of polygraph evidence, the Supreme Court has held that "[a] defendant's right to present

67

relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998). The Court observed that "federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," and that they had "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Id. Applying these principles, the Court held that because of concerns over the reliability of polygraph evidence, a per se exclusion of any polygraph evidence did not violate the Constitution. Id. at 311. It determined that a rule excluding polygraph evidence "does not implicate any significant interest of the accused" because in the absence of polygraph evidence, a defendant still maintains the ability to testify on their own behalf and present their own factual evidence. Id. at 316-17. The Court concluded that the exclusion of polygraph evidence does not significantly impair a defendant's defense, as polygraph evidence is merely "expert opinion testimony to bolster [the defendant's] own credibility." Id. at 317.

The District Court did not err by excluding Gonzalez's polygraph evidence. Because a per se rule against polygraph evidence is constitutionally permissible, see id. at 311, then the District Court's decision to exclude this polygraph evidence after a thorough, well-reasoned, and careful opinion, is certainly not an abuse of discretion. For the reasons articulated in its supplemental opinion, the District Court's concerns about the polygraph examination's reliability were sufficient to support its decision to exclude the proffered polygraph rebuttal evidence. Accordingly, we will affirm the District Court's exclusion of the polygraph evidence.

## 5. Character Evidence Cross-Examination

The defendants next argue that the District Court erred in ruling that if Gonzalez called witnesses to testify to her character, the Government would be permitted to either cross-examine those witnesses on Gonzalez's character or offer some evidence in rebuttal. Gonzalez sought to present the testimony of several character witnesses as to her honesty, peacefulness, and law-abiding behavior, but declined to do so after the District Court ruled that the Government would be permitted to provide rebuttal evidence about her involvement in the kidnapping of her nieces by David and Lenore. She contends that this denied her the opportunity to put on a complete defense.

We disagree. Rule 404(a) directly addresses this situation. It states that "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." Fed. R. Evid. 404(a)(2)(A). Rule 405 permits "an inquiry into relevant specific instances of the person's conduct" during "cross-examination of the character witness." Fed. R. Evid. 405(a). The District Court was well within the bounds of the Federal Rules of Evidence when it ruled that it would permit the Government to present rebuttal evidence if Gonzalez opened the door on the issue of her character. Accordingly, the District Court did not abuse its discretion in making this ruling. Further, by electing not to put on such evidence, Gonzalez failed to preserve this issue for appeal. See United States v. Moskovits, 86 F.3d 1303, 1305-06 (3d Cir. 1996).[17]

---

[17] The defendants also contend that the cumulative effect of these evidentiary errors was prejudicial. This

69

**E. Sentencing Challenges**

The defendants also raise four challenges to their sentences. They bring a challenge under the Fifth and Sixth Amendments to the District Court's factual findings, challenges to the District Court's application of the Official Victim and Vulnerable Victim Guidelines, and an Eighth Amendment challenge to the length of Gonzalez's sentence. "We exercise plenary review over the District Court's interpretation of the Sentencing Guidelines and constitutional questions." United States v. Lennon, 372 F.3d 535, 538 (3d Cir. 2004). And, "[w]e review the District Court's factual findings for clear error, and the District Court's application of those facts to the Guidelines for an abuse of discretion." Id. (citations omitted).

### 1. Fifth and Sixth Amendments

The defendants contend that the District Court violated both the Fifth and Sixth Amendments in calculating their advisory Sentencing Guidelines ranges using a preponderance of the evidence standard to make additional findings of fact. They argue that the District Court should only have applied factual findings made beyond a reasonable doubt by the jury and should not have made any additional factual findings. They contend that the District Court's actions violate the Supreme Court's sentencing jurisprudence following

cumulative error challenge was not raised below, and thus is subject to review for plain error. Because none of the rulings was an error, by definition, the cumulative effect of each non-error could not be prejudicial.

Apprendi, 530 U.S. at 490. We disagree. The District Court did not violate Apprendi because it did not make any findings that raised the defendants' sentences above the statutory maximum. Instead the District Court's findings adjusted the applicable range of the advisory Sentencing Guidelines.

We have previously rejected the defendants' position in an en banc decision, where we held that Apprendi does not apply when a district court makes factual findings that affect the advisory guidelines but not the statutory maximum. See United States v. Grier, 475 F.3d 556, 565 (3d Cir. 2007) (en banc). In Grier we confronted a similar challenge and held "that the right to proof beyond a reasonable doubt does not apply to facts relevant to enhancements under an advisory Guidelines regime." Id. Nevertheless, the defendants argue that we should not follow the binding precedent of Grier because intervening decisions by the Supreme Court, such as Alleyne v. United States, 570 U.S. 99 (2013), have cast doubt on its reasoning. However, we have expressly rejected that position and continued to follow Grier. See United States v. Smith, 751 F.3d 107, 117 (3d Cir. 2014) (determining that Alleyne "did not curtail a sentencing court's ability to find facts relevant in selecting a sentence within the prescribed statutory range").

Although the defendants encourage us to follow the dissenting opinion in Grier, we are bound to follow Grier and Smith. Here, the statutory maximum was life imprisonment. 18 U.S.C. § 2261(b)(1). The District Court made additional factual findings to apply the First Degree Murder sentencing cross-reference, which "applies when death results from the commission of certain felonies." U.S.S.G. § 2A1.1 cmt. n.1. This increased the defendants' Guidelines range. But the

71

District Court's findings did not increase the statutory maximum. Thus, the District Court did not run afoul of Apprendi. 530 U.S. at 490. In sum, the District Court did not violate the defendants' Fifth and Sixth Amendment rights.[18]

### 2. Official Victim Enhancement

The defendants[19] next contend that the District Court erred in applying the Official Victim enhancement in the Sentencing Guidelines, U.S.S.G. § 3A1.2(c)(1), to David. The Official Victim enhancement, in relevant part, applies

---

[18] We decline to consider the additional challenge to his Guideline range that David seeks to incorporate by reference to his arguments made before the District Court. See Matusiewicz Br. 82 ("The defense also presented two alternative advisory Guidelines ranges based on other Guidelines, but the district court ignored these arguments. The defense also argued, and incorporates here, that the cross-reference could not be applied on the basis of relevant conduct."). By failing to include this argument in his brief, it is waived. See Tunis Bros. v. Ford Motor Co., 952 F.2d 715, 741 (3d Cir. 1991) ("We shall not address the issues raised by the plaintiffs on their cross-appeal as the plaintiffs waived them by failing to argue them in their briefs. Instead of providing argument with respect to their issues, the plaintiffs merely referred to their pre- and post-trial briefs. We therefore decline to address those issues." (citations omitted)).

[19] Although Gonzalez joins this argument, see Gonzalez Br. 3, the District Court did not apply this enhancement to her sentence.

> [i]f, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom. . . .

U.S.S.G. § 3A1.2(c)(1). The defendants' argument relies on their sufficiency of the evidence challenge; that is, they argue that this enhancement should not apply because David did not know of his father's plan to kill Belford, and thus, it was not reasonably foreseeable to him that law enforcement officers might have been harmed during the course of the conspiracy. The defendants argue that David's mere presence in the courthouse is an insufficient basis on which to base this enhancement.

The District Court applied this enhancement because Thomas shot and wounded two police officers in the course of the shootout following his killing of Belford. Additionally, the District Court found that conducting a shooting in a courthouse lobby, where officers were present, created a reasonably foreseeable chance of harm coming to those officers. The jury found that David's actions resulted in the death of Belford. As a result, during sentencing, the District Court found that David was a knowing participant in his father's plans on the day of the shooting and he had a "specific intent to kill Belford." App. 6057. The District Court concluded that in light of the fact that David was present in the courthouse lobby, had accompanied his father there, and was aware of the events that were about to transpire, it was "entirely foreseeable" that there would be a

73

potential threat to the numerous uniformed law enforcement officers present in the courthouse lobby. App. 6050.

We agree. In light of the evidence presented at trial and before the District Court, the District Court's application of the facts to this enhancement was not an abuse of discretion. It was entirely reasonable for the District Court to find that it was foreseeable to David that a law enforcement officer might be harmed in the events that were about to transpire. Accordingly, the District Court did not err in applying this enhancement.

### 3. Vulnerable Victim Enhancement

The defendants next contend that the District Court abused its discretion in applying the Vulnerable Victim enhancement, U.S.S.G. § 3A1.1(b)(1), because they claim that the Government failed to prove the existence of the requisite nexus between the vulnerable status of the victims and the ultimate success of the crime. The District Court determined that there was such a nexus and applied the enhancement, finding that Belford's children were victims of the defendants' stalking campaign.

The Vulnerable Victim enhancement, in relevant part, applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The application note to this enhancement defines a "vulnerable victim" as a victim of the defendant's offense of conviction, and any other conduct for which the defendant is responsible, that is "particularly susceptible" or "unusually vulnerable" to the criminal conduct due to, inter alia, their age, physical condition, or mental condition. U.S.S.G. § 3A1.1 cmt. n.2. In addition, we require that "the defendant knew or should

74

have known of this susceptibility or vulnerability" and that it "facilitated the defendant's crime in some manner." United States v. Iannone, 184 F.3d 214, 220 (3d Cir. 1999); see also United States v. Monostra, 125 F.3d 183, 190 (3d Cir. 1997) (requiring "a nexus between the victim's vulnerability and the crime's ultimate success" (quoting United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992))).

The District Court did not abuse its discretion in applying the Vulnerable Victim enhancement. Belford had young children at the time she was killed, who also suffered through the defendants' years-long stalking campaign. As young children, they were "particularly susceptible or vulnerable to the criminal conduct." Iannone, 184 F.3d at 220; see also United States v. Walker, 665 F.3d 212, 233 (1st Cir. 2011) ("Minors are often regarded as especially vulnerable victims."). The defendants certainly knew of the young ages of the children to whom they were related. All of Belford's children were victims of the stalking conduct targeted at their mother. Indeed, some of them testified at trial that they were aware of the stalking campaign — which included false allegations that one of the children had been sexually molested by her mother — and that they were afraid both for their own safety and that of their mother. App. 2654-58. Due to their young age, all of these children were more likely to experience substantial emotional distress as a result of the defendants' conduct; they were powerless to protect themselves from allegations of sexual abuse, and as children, were less able to defend and protect themselves against any attempted harm from the adult defendants. These fears were reasonable in light of the fact that two of the defendants, David and Lenore, previously had kidnapped the children. Accordingly, the

District Court did not err in applying of the Vulnerable Victim enhancement.[20]

### 4. Eighth Amendment

Finally, Gonzalez brings an Eighth Amendment challenge to her sentence of life imprisonment. We have held that "a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment." United States v. Miknevich, 638 F.3d 178, 186 (3d Cir. 2011). Gonzalez's life sentence was authorized by statute and recommended by the Sentencing Guidelines. See 18 U.S.C. § 2261(b)(1); U.S.S.G. § 2A1.1; App. 6048. In sentencing Gonzales to life imprisonment, the District Court noted that she played an instrumental role in the conspiracy against Belford, whose death was a reasonably foreseeable consequence of the conspiracy. Thus, her life sentence does not violate the Eighth Amendment.

## IV. Conclusion

---

[20] Additionally, even if both the Official Victim and Vulnerable Victim enhancements were applied in error, the error would be harmless as the relevant Guidelines range would be the same without either enhancement. See United States v. Isaac, 655 F.3d 148, 158 (3d Cir. 2011) ("However, the error was completely harmless because even with the one point reduction, Isaac would remain in criminal history category IV and the same Guideline range would have applied.").

For the foregoing reasons, and recognizing the outstanding work of Judge McHugh, we will affirm in all respects.