*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No.  16-FM-383

LAUREN MASHAUD, APPELLANT,

V.

CHRISTOPHER BOONE, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CPO-739-14)

(Hon. Fern Flanagan Saddler, Trial Judge)

(Argued March 29, 2017                    Decided August 12, 2021)

*Matthew B. Kaplan* for appellant.

*Governor E. Jackson III*, for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and FISHER,[*] *Senior Judge.*

Opinion for the court by *Senior Judge* FISHER.

Dissenting opinion by *Associate Judge* BECKWITH at page 17.

---

[*] Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

FISHER, *Senior Judge*: The trial court entered a civil protection order (CPO) against appellant Lauren Mashaud based on a finding that he stalked appellee Christopher Boone by sending emails and Facebook messages to Mr. Boone's coworkers, family, and friends informing them that Mr. Boone had engaged in an extramarital affair with Mr. Mashaud's wife. Appellant contends that there was insufficient evidence to prove that he engaged in stalking and that, in any event, his speech was protected by the First Amendment. We conclude that the trial court erred in its resolution of appellant's First Amendment argument, reverse the entry of the CPO, and remand for further proceedings consistent with this opinion.

**I.**

The trial testimony in this case established the following facts, most of which are undisputed. Mr. Mashaud's wife (Ms. W) was working as an intern at a consulting firm when she began an affair with Mr. Boone, a vice president of the firm. The affair began in May 2013 after Ms. W and Mr. Boone attended a company happy hour. Mr. Boone testified that at the time, he believed Ms. W was unmarried, though she had mentioned being in a "rocky relationship" with a boyfriend. According to Mr. Boone, when Ms. W disclosed the following week that she was married, he was "in a complete state of shock and disbelief," told her

that he could not knowingly engage in an extramarital affair, and ended the relationship. The next day, Ms. W told Mr. Boone that Mr. Mashaud had found out about the affair and informed Mr. Boone of her plans to send him a "no contact" letter via email. Mr. Boone testified that although Ms. W told her husband the affair was over, he and Ms. W continued to email each other through July 2013.

Two months later, Mr. Mashaud sent an email to three senior employees of the consulting firm, "cc'ing" Mr. Boone at his personal and work email addresses. This email stated its intent "to bring a matter to your attention that may be a violation of [the firm's] Code of Conduct and/or other policies, procedures, business ethics, and character or standard"— namely, that Mr. Boone and Ms. W had been "involved in an extramarital affair that took place, primarily, in the workplace." The message went on to state that "[a]side from the potential sexual harassment claims this situation presents, it also involves the inappropriate use of company resources and assets" as the two "have used company time and company resources to further their affair." Mr. Mashaud's email concluded:

> Christopher Boone was previously sent a no contact email from my wife on May 11, 2013 (as attached), but he continues to ignore our request and fails to respect our boundaries to allow my wife and I to heal and to regain

> the integrity of our marriage . . . . I will anticipate a response from you once you have investigated these concerns and taken appropriate corrective action.

Attached to Mr. Mashaud's email were copies of several email exchanges between Ms. W and Mr. Boone. Mr. Boone testified that upon receiving this email he felt violated, threatened, and embarrassed. The evidence showed that Mr. Boone replied to the email, stating his willingness to meet and talk the matter through, but that Mr. Mashaud did not respond.

About three months later, Mr. Mashaud informed some of Mr. Boone's friends and family members of the affair through Facebook. As Mr. Mashaud explained in his testimony, Mr. Boone's cover photo and the list of people who had "liked" it were publicly available on Facebook, and for the price of one dollar Facebook allowed users to send messages to any other user, even if the two had no connection. Mr. Mashaud paid this fee and sent messages to at least fifteen users who had liked Mr. Boone's photo. These messages included much of the same information as the email to the consulting firm, stating that each recipient "should know the kind of person Christopher Boone really is," that Mr. Boone had "had a sexual affair with [Mr. Mashaud's] wife," and that Mr. Boone showed he lacked "integrity and respect for himself" by "fail[ing] to respect the boundaries of a married woman." Attached to these Facebook messages was a photo of Mr. Boone

and Ms. W with another firm employee. Mr. Boone testified that when he learned about the messages he again felt violated and threatened, confused as to how Mr. Mashaud had learned his friends' and family members' contact information, and worried for their personal safety.

The evidence at the hearing also showed that Mr. Mashaud created a blog — called "The Power of Light and Truth" — in which he addressed issues relating to the aftermath of affairs. The publicly accessible blog mentioned Mr. Boone by name and included links to his social media accounts and his firm biography. When Mr. Boone saw the blog, he filed a police report. He also initiated the CPO action at issue in this case, alleging that Mr. Mashaud was harassing and stalking him.

At a bench trial on the CPO matter, Mr. Mashaud defended against the accusations of stalking by arguing that the evidence was insufficient to satisfy the elements of stalking and that the communications at issue — the email to the firm, the Facebook messages, and the blog posts — were constitutionally protected and therefore fell outside the scope of the stalking statute. The trial court concluded that none of the communications was constitutionally protected, found good cause to believe Mr. Mashaud had committed the offense of stalking, and issued a CPO

against Mr. Mashaud. *See* D.C. Code § 16-1005(c). In addition to ordering both Mr. Mashaud and his wife not to assault, threaten, harass, or stalk Mr. Boone or destroy his property; to stay away from Mr. Boone's person, home, workplace, and vehicle; and not to contact Mr. Boone in any manner, the CPO also required Mr. Mashaud to enroll in a domestic violence intervention program and ordered him to pay Mr. Boone $1,800 for medical expenses he had incurred. Moreover, the CPO prohibited Mr. Mashaud from "communicat[ing] about [Mr. Boone] by name or by implication on the internet or social media."

Mr. Mashaud appealed, and we reversed the entry of the CPO on the ground that the trial court had relied on an outdated version of the stalking statute. *Mashaud v. Boone*, No. 14-FM-894, Mem. Op. & J. (D.C. Feb. 29, 2016). On remand, the trial court reaffirmed its ruling that the email and the Facebook messages were not constitutionally protected because they related to matters of purely private concern, but it reached the opposite conclusion with respect to the blog posts, ruling that the blog was protected. Applying the correct version of the statute to the email and the Facebook messages, the court once again found good cause to believe Mr. Mashaud had committed the offense of stalking and reissued

the CPO.[1]   It concluded that appellant acted with a "vindictive motive" and "engaged in this behavior repeatedly . . . with the intent to cause [Mr. Boone] to feel seriously alarmed, disturbed, or frightened or suffer emotional distress."

## II.

Mr. Mashaud devotes much of his brief to his contention that D.C.'s stalking statute, both facially and as applied in this case, unconstitutionally infringed upon his freedom of speech.  He also argues that the evidence in the record was insufficient to establish that he committed the crime of stalking, and thus insufficient to support the court's issuance of a CPO on that ground.

The District of Columbia's stalking statute states that a person may not "purposefully engage in a course of conduct directed at a specific individual" intending, knowing, or having reason to know that his or her course of conduct would cause the individual to "[f]ear for his or her safety or the safety of another person;" to "[f]eel seriously alarmed, disturbed, or frightened;" or to "[s]uffer

---

[1] By the terms of the CPO, its prohibitions expired long ago.  Nevertheless, the requirement to pay $1,800 for medical expenses may save this appeal from being moot.

emotional distress." D.C. Code § 22-3133(a)(1)-(3). By its express language, however, the statute "does not apply to constitutionally protected activity." *Id.* § 22-3133(b). (Note the phrasing: "constitutionally protected activity" instead of "constitutionally protected speech"). Thus, if Mr. Mashaud's activity in this case —repeatedly sending emails and messages to third parties with, as the trial court found, a "vindictive motive" and "the intent to cause [Mr. Boone] to feel seriously alarmed, disturbed, or frightened or suffer emotional distress" — was "constitutionally protected," the statute would not encompass his conduct.

We have not delineated the contours of the statutory exception for "constitutionally protected activity," and the text of D.C. Code § 22-3133(b) does not provide an unambiguous answer. One view is that the government may not criminalize any speech except for that which falls into "existing, well-established First Amendment exceptions" such as libel, threats, or obscenity. *See* Eugene Volokh, *One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking*," 107 Nw. U. L. Rev. 731, 762–67 (2013). The exception might, on the other hand, be read as a safety valve which states a truism — that the stalking statute "doesn't mean to cover that speech or action that it isn't allowed to cover." *Id.* at 765. We need not decide today where the line between constitutionally protected and unprotected conduct falls because we encounter at

the outset an analytical misstep which requires a remand.

### A.    Protection for Speech About Matters of Private Concern

The trial court ruled that neither the email to the firm nor the Facebook messages were protected communications for purposes of § 22-3133. In the trial court's view — a view Mr. Boone defends on appeal — these communications all involved "matters of purely private rather than public concern" and therefore were not constitutionally protected. This conclusion misapprehends the extent of protection provided by the First Amendment for communications about matters of purely private concern.

The Supreme Court has differentiated between matters of public and private concern to explain why speech involving matters of public concern warrants *heightened* protection. But the Court has rejected the proposition that speech must relate to a matter of public interest to merit First Amendment protection. *See, e.g.*, *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 600 (2008) (stating that the government "could not generally prohibit or punish, in its capacity as sovereign, speech on the ground that it does not touch upon matters of public concern"); *Connick v. Myers*, 461 U.S. 138, 147 (1983) ("We in no sense suggest that speech

on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction.").[2]

In sum, a communication does not lose First Amendment protection merely because it discusses matters of private rather than public concern. We therefore remand for the trial court to consider in the first instance whether the evidence proved stalking given that speech about matters of private concern may enjoy constitutional protection. While the trial court did make the analytical misstep we have described, it is not clear to us whether the misstep ultimately affected the court's conclusion about stalking. The court repeatedly focused on Mr. Mashaud's course of conduct intended to cause serious alarm to Mr. Boone by taking steps to

---

[2] *See also, e.g.*, *Klen v. City of Loveland*, 661 F.3d 498, 509 (10th Cir. 2011) ("[P]laintiffs' speech was not robbed of constitutional protection even if it involved only matters of private concern."); *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009) ("While there are different rung[s in] the hierarchy of First Amendment values, . . . we conclude that a prisoner's speech can be protected even when it does not involve a matter of public concern." (internal quotation marks and citation omitted) (brackets in original)); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 284 (3d Cir. 2004) ("[W]hile speech on topics of public concern may stand on the 'highest rung' on the ladder of the First Amendment, private speech (unless obscene or fighting words or the like) is still protected on the First Amendment ladder."); *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1333 (5th Cir. 1993) ("Although speech on matters of private concern is of less constitutional value than is speech on matters of public concern, . . . such speech is not totally unprotected by the First Amendment." (citation omitted)).

contact his co-workers, friends, and family, in a manner designed to come to Mr. Boone's attention, about "very personal matters" involving Mr. Boone. The court repeatedly used the phrase "personal matters such as," suggesting that it was not the particular content of the Mr. Mashaud's messages, but instead the very personal nature (potential sexual harassment, an extramarital affair) of what Mr. Mashaud chose to expose to people who were in Mr. Boone's circle but with whom Mr. Mashaud did not have relationships, that drew the trial court's focus. It appears to us that the trial court might have reached the same conclusion even if it had understood that communications about particular matters of private concern enjoy a measure of constitutional protection.

Although we deem it premature to address in depth the additional questions discussed in Judge Beckwith's dissenting opinion, we would not remand for further proceedings if we were persuaded at this juncture that the CPO was invalid either because it violated appellant's First Amendment rights or because the stalking statute did not apply to appellant's activity. Contrary to our colleague's suggestion, we are not shirking our duty by remanding. We will benefit from the perspective of this experienced CPO judge on whether, as in *Gonzalez*, the course of conduct here "served no legitimate purpose other than to harass and intimidate." *United States v. Gonzalez*, 905 F.3d 165, 193 (3rd Cir. 2018). That fact-bound

assessment will help inform our view of whether Mr. Mashaud was engaged in "constitutionally protected activity."

Without expressing an ultimate view on that question, we mention some issues the trial court should consider. What follows should not be construed in any way as a comprehensive summary of the First Amendment issues that are raised. It is intended, rather, to refer to several points that should be considered in addition to those discussed by Judge Beckwith.

**B.** **Settled Exceptions to First Amendment Protection of Speech**

*United States v. Stevens*, 559 U.S. 460 (2010), discussed categories of speech that are not entitled to protection under the First Amendment. In that case, Congress had criminalized the creation, sale, or possession of certain depictions of animal cruelty: only the portrayal of animal cruelty (as opposed to the underlying conduct itself) was criminal under this statute. *Id.* at 464-65. The Court held that the statute was unconstitutionally overbroad, stating that the government may only proscribe speech that falls into certain "well-defined and narrowly limited classes of speech," such as obscenity, fraud, defamation, or speech integral to criminal conduct — all categories of speech that historically had not merited First

Amendment protection. *See id.* at 468-69. In the Court's words, "[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *Id.* at 470. The Court rejected the government's argument that depictions of animal cruelty should be added to the list. *See id.* at 469; *see also, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (stating that content-based restrictions on speech are "presumptively invalid").

Mr. Boone focuses his argument on "speech integral to criminal conduct," an exception that generally applies to speech used to induce or procure the commission of a crime, such as conspiracy and solicitation. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (upholding injunction barring labor union from picketing in an effort to pressure a company to violate state trade laws); *United States v. Williams*, 553 U.S. 285, 297-98 (2008) (holding that offers to provide or requests to obtain child pornography are unprotected under this exception). In Mr. Boone's view, Mr. Mashaud's speech was "integral to criminal conduct, the criminal conduct in this case being that of 'stalking' as statutorily proscribed."[3]

---

[3] Of course, appellant Mashaud was not charged with a crime, but issuance of the CPO was based upon the court's finding of "good cause" to believe that he

(continued…)

Some courts have rejected such reasoning as circular, *see, e.g.*, *Matter of Welfare of A.J.B.*, 929 N.W.2d 840, 852 (Minn. 2019) (concluding that "the communication itself" criminalized by a stalking statute did not fall into speech integral to criminal conduct exception), and have held that the "speech integral to criminal conduct" exception applies only where the speech is integral to conduct forbidden by a separate criminal prohibition. *See United States v. Hobgood*, 868 F.3d 744, 747 (8th Cir. 2017) (affirming appellant's conviction under interstate stalking statute because the speech that formed the basis of the stalking charge was integral to the separate crime of extortion); *Burroughs v. Corey*, 92 F. Supp. 3d 1201, 1209 n.16 (M.D. Fla. 2015) ("[S]peech is unprotected where it is integral to criminal conduct forbidden under *another* statute . . . ." (emphasis added)), *aff'd*, 647 F. App'x 967 (11th Cir. 2016).

That view is not unanimous, however, as various cases applying the interstate stalking statute, 18 U.S.C. § 2261A, illustrate. Although the facts of *United States v. Gonzalez*, 905 F.3d 165 (3rd Cir. 2018), are different from those presented here, the court's analysis is instructive. The defendants had been

(…continued)
had committed the crime of stalking. *See* D.C. Code § 16-1005(c).

convicted of interstate stalking and conspiracy to commit that offense based on a concerted effort to gain custody of three children to whom they were related. Their conduct included sending correspondence to Belford (the mother) and her children, contacting third parties, and posting derogatory information on the internet. The Third Circuit rejected arguments that the convictions violated the First Amendment. *Id*. at 194. The conduct of Gonzalez was defamatory (an exception not invoked here), but "[e]ven if it were not defamatory," the court held, "this speech is still unprotected as it falls squarely into the 'speech integral to criminal conduct' exception. The defendants' speech served no legitimate purpose other than to harass and intimidate Belford, conduct that is illegal under [18 U.S.C.] § 2261A." *Id*. at 193. The speech was part of a course of conduct, and the criminal conduct was the stalking itself. "[I]t is the intent with which the defendants engaged in this conduct, and the effect this conduct had upon the victims, that makes what the defendants did a criminal violation." *Id*. at 194.[4]

---

[4] In *United States v. Smith*, 685 A.2d 380 (D.C. 1996), this court rejected a First Amendment challenge to a previous version of the District of Columbia stalking statute, which "criminalize[d] certain conduct, such as harassing, that may in certain situations include speech." *Id*. at 387. We explained that, "while certain of [the defendant's] actions may appear to be constitutionally protected when viewed separately, when such activities are repeated and combined with the criminal intent necessary to violate the statute, they are no longer protected." *Id*. at 388.

Other courts have reached similar conclusions, emphasizing that the interstate stalking statute does not criminalize speech itself, but a course of conduct. *See*, *e.g.*, *United States v. Ackell*, 907 F.3d 67, 73, 78 (1st Cir. 2018) ("By its own terms, § 2261A(2)(B) regulates not speech, but conduct — or, to be precise, 'course[s] of conduct.'"; because the statute does not target speech, it cannot be "an impermissible content- or viewpoint-based restriction on speech"); *United States v. Osinger*, 753 F.3d 939, 947 (9th Cir. 2014) ("Any expressive aspects of Osinger's speech were not protected under the First Amendment because they were ''integral to criminal conduct'' in intentionally harassing, intimidating or causing substantial emotional distress to V.B."); *United States v. Petrovic*, 701 F.3d 849, 855-56 (8th Cir. 2012) ("the interstate stalking statute is viewpoint neutral"; it is directed toward courses of conduct, not speech); *see also Giboney*, 336 U.S. at 502 ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

## IV.

The revised civil protection order entered on April 12, 2016, is hereby vacated, and this case is remanded to the Superior Court for further proceedings

consistent with this opinion.

*So ordered.*

BECKWITH, *Associate Judge*, dissenting: The trial court in this case found that Lauren Mashaud committed the offense of stalking when he sent an email message and a Facebook message to Christopher Boone's friends, family, and coworkers commenting on Mr. Boone's romantic relationship with Mr. Mashaud's wife. Having rejected Mr. Mashaud's contention that his messages were constitutionally protected and thus outside the reach of the stalking statute, the court entered a civil protection order against Mr. Mashaud (ordering him, among other things, to pay for Mr. Boone's therapy and to stop talking about Mr. Boone on social media). My colleagues in the majority now hold that the trial court erred in determining that because Mr. Mashaud's messages involved "matters of purely private rather than public concern," they were not constitutionally protected. In concluding that the trial court's "analytic misstep" "requires a remand," the majority forgoes deciding the central and squarely presented question in this case—what it actually means to be constitutionally protected under the statute.

This court should decide now what D.C.'s stalking law means when it states

that it "does not apply to constitutionally protected activity."[1] D.C. Code § 22-3133(b) (2020 Supp.). Our resolution of this question would obviate a remand or explain what standard the trial judge is supposed to apply on remand. We have already sent this case back once as a result of the trial court's misapplication of the stalking statute. We should not set the stage for a third appeal presenting the same central question of statutory interpretation that is teed up here in this appeal. As the majority notes, the stalking statute's exception for "constitutionally protected activity" could mean that the statute applies only to conduct that falls within the established exceptions to First Amendment protection.[2] *Ante* at 8. Or it could be a truism signifying that the statute "doesn't mean to cover that speech or action that it isn't allowed to cover." *Ante* at 8 (quoting Eugene Volokh, *One-to-One Speech*

---

[1] This phrase appears after the statute lays out the elements of the offense of stalking. Under D.C. Code § 22-3133(a) (2012 Repl.), it is unlawful for a person to "purposefully engage in a course of conduct directed at a specific individual" if the person either intended to cause that individual to, or knew or should have known that his actions would cause that individual reasonably to, "(A) Fear for his or her safety or the safety of another person; (B) Feel seriously alarmed, disturbed, or frightened; or (C) Suffer emotional distress."

[2] These classes of categorically unprotected speech include speech integral to criminal conduct, *see Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); true threats, *see In re S.W.*, 45 A.3d 151, 156 (D.C. 2012); fraud, *see Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976); incitement, *see Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969); obscenity, *see Reno v. ACLU*, 521 U.S. 844, 872, 883 (1997); and defamation and libel, *see Solers, Inc. v. Doe*, 977 A.2d 941, 951 (D.C. 2009).

*vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking,"* 107 Nw. U. L. Rev. 731, 765 (2013)).  But whatever the answer, we have every reason to resolve this issue now and no good reason not to.  I respectfully dissent from the majority's decision to leave this basic question unsettled by ordering an unwarranted remand.

On the merits, the most sensible reading of § 22-3133(b)'s statement that the stalking statute "does not apply to constitutionally protected activity" is that it applies only to constitutionally *unprotected* activities—specifically, activities that fall within the categories of speech the Supreme Court has recognized as unprotected by the First Amendment.[3]  D.C. Code § 22-3133(b).  This meaning better tracks § 22-3133(b)'s language, and has the benefit of aligning with the only published opinion in D.C.—a Superior Court decision—to grapple with the issue thus far.  *See Gray v. Sobin*, 2014 WL 624406, at *1 (D.C. Super. Ct. Feb. 14, 2014).  In *Gray v. Sobin*, which involved a request for a CPO by a woman who worked as a sex offender registry specialist, the court considered whether the respondent had committed the offense of stalking by communicating disparaging information about the petitioner on numerous flyers and on a website labeled "The

---

[3] *See supra* note 2.

Idiot's Registry." Superior Court Judge Todd Edelman described the statute this way: "[T]he ultimate question before the Court was not whether the stalking statute is unconstitutional, or whether applying the statute to [the respondent there] would violate his constitutional rights." *Id.* at *2. The question was whether "the conduct engaged in by [the respondent] qualified as 'constitutionally protected activity.'" *Id.* If it did, then the respondent "simply did not commit the offense of stalking under District law." *Id.* The court in *Gray* characterized "constitutionally protected activity" as speech that "did not fall into any of [the] unprotected categories" singled out by the Supreme Court. *Id.* at *6 (referring to *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.")). It accordingly denied the CPO after determining that the respondent's conduct did not fall within one of the "few categories of speech" that "are not afforded any First Amendment protection." *Id.*[4]

---

[4] The court also gave great weight to the fact that respondent's speech involved matters of public concern and was thus "entitled to special protection." *Gray*, 2014 WL 624406 at *3 (quoting *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011)).

This interpretation of the statute is both more plausible and less prone to constitutional challenge than any suggestion that § 22-3133(b) exempts only speech that the government cannot constitutionally restrict (because, for example, it would fail a strict-scrutiny test). *See* Volokh, *One-to-One Speech*, *supra*, at 762–67 (indicating that, in addition to being superfluous, this "broader interpretation"—that § 22-3133(b) refers only to "activity that the statute can't constitutionally restrict"—"poses serious constitutional problems"). This is likewise how the trial court here appeared to understand § 22-3133(b) when it set out to determine whether speech on private matters was or was not "constitutionally protected" and when it determined that Mr. Mashaud's messages, for example, were "not exempt" from "the District of Columbia's Stalking Statute, Part B."[5] And as in *Gray v.*

---

[5] The trial court reached this conclusion after noting that "subpart (b) says this section does not apply to constitutionally protected activity" and after indicating that it had considered and viewed as helpful Judge Edelman's opinion in *Gray v. Sobin*—an opinion, as noted above, that viewed the "constitutionally protected activity" provision as an exemption that tracked the Supreme Court's established categories of unprotected speech and obviated resolution of the constitutional challenges to the stalking statute. *See* Trial Tr. 14, Apr. 12, 2016 (trial court stating that the Facebook messages were "not constitutionally protected speech and [were] not exempt from the District's Stalking Statute"); *id.* at 17 (a handwritten letter was "not constitutionally protected speech and [was] not exempt from the District's Stalking Statute"); *id.* at 19-20 (one of Mr. Mashaud's blog posts "qualifie[d] as constitutionally protected speech" and so fell "outside the scope of the District's Stalking Statute"). In his response to Mr. Boone's petition for a CPO, Mr. Mashaud explicitly argued that his communications were exempt

(continued…)

*Sobin*, while both parties here address the constitutional validity of the stalking statute as applied to Mr. Mashaud's conduct, we have no reason to analyze the statute's constitutionality if the messages sent by Mr. Mashaud qualify as constitutionally protected speech.

Mr. Boone argues, among other things, that the trial court was correct in concluding that Mr. Mashaud's email and Facebook messages were not constitutionally protected speech because they involved matters of private concern. As the majority makes clear, however, the trial court "misapprehend[ed] the extent of protection provided by the First Amendment for communications about matters of purely private concern." *Ante* at 9. Although speech involving matters of public interest "occupies the 'highest rung of the hierarchy of First Amendment values,'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)), speech regarding private matters is still constitutionally protected, though "its protections are less stringent." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760 (1985); *see*

---

(…continued)
from the stalking statute under D.C. Code § 22-3133(b) because they constituted "constitutionally protected activity." Resp't's Mot. Summ. J. 5, Apr. 8, 2014.

*also Connick*, 461 U.S. at 147.[6]

Mr. Boone argues, in the alternative, that Mr. Mashaud's messages to Mr. Boone's coworkers and friends were not constitutionally protected under § 22-3133(b) because they were integral to criminal conduct—one of the "well-defined and narrowly limited classes of speech" entitled to no constitutional protection. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (quoting *Chaplinsky*, 315

---

[6] A stalking statute that exempts "constitutionally protected activity" may still criminalize otherwise protected statements on a private matter where those statements are uttered in such a harassing, intimidating, or threatening manner that they trigger a well-settled exception to First Amendment protection. *See, e.g.*, *State v. Helfrich*, 922 P.2d 1159, 1163 (Mont. 1996). So, for example, "'you cheated on your tax return' may be a [protected] statement[,] but that does not necessarily mean that I have the right to telephonically remind you of that fact every morning at 2:00 a.m." *Id.* The trial court here concluded that Mr. Mashaud committed the offense of stalking because his communications exposed the embarrassing and personal fact of an extramarital affair and accused Mr. Boone of workplace misconduct, not because of the harassing, intimidating, or threatening nature of those communications. The court's conclusion was premised on two of Mr. Mashaud's actions—emailing Mr. Boone's employers with truthful information about an affair and messaging Mr. Boone's friends and family on Facebook with truthful information about an affair—and the court emphasized that the *content* of the revelations about Mr. Boone's extramarital affair would be alarming to reasonable people. *Cf., e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (stating that content-based restrictions on speech are "presumptively invalid"). "[W]hen the communication causes annoyance because of its offensive content, rather than for other reasons (for instance, because it causes a phone to ring in the middle of the night), restricting such a communication because of its annoying content is a form of content-based speech restriction." Volokh, *One-to-One Speech*, *supra*, at 768–69 (footnote omitted).

U.S. at 571). The Supreme Court case from which this exception mainly emerged, *Giboney v. Empire Storage & Ice Co.*, established that the First Amendment extends no protection to "speech or writing used as an integral part of conduct in violation of a valid criminal statute." 336 U.S. 490, 498 (1949). The speech in question in *Giboney* was a labor union's picketing in an effort to pressure another company to violate state trade laws, but the exception also works to exclude from First Amendment protection other speech, such as conspiracy, incitement, or solicitation, that plays an integral role in a criminal offense. *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 297–98 (2008) (declining to extend First Amendment protection to non-commercial offers to provide or receive child pornography).

Mr. Boone suggests that Mr. Mashaud's speech was integral to criminal conduct because it was statutorily proscribed by the District's stalking statute. As my colleagues in the majority point out, *see ante* at 13–14, a number of courts have rejected such reasoning as circular, concluding that "speech cannot be unprotected only because it is criminal in the challenged statute." *Burroughs v. Corey*, 92 F. Supp. 3d 1201, 1209 n.16 (M.D. Fla. 2015) (agreeing with the appellant's assertion that an argument that certain speech constituted speech integral to criminal conduct

was circular "because the speech is only integral to criminal conduct because this statute criminalizes the conduct"), *aff'd*, 647 F. App'x 967 (11th Cir. 2016); *see also, e.g.*, *United States v. Matusiewicz*, 84 F. Supp. 3d 363, 369 (D. Del. 2015) ("Under the broadest interpretation [of *Giboney*], if the government criminalized any type of speech, then anyone engaging in that speech could be punished because the speech would automatically be integral to committing the offense."). This view makes sense. *See* Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 1035–43 (2016); *see also id.* at 1011 ("It is not enough that the speech itself *be labeled* illegal conduct . . . . Rather, it must help cause or threaten *other* illegal conduct . . . ."). Reading *Giboney* so expansively to deny constitutional protection to any speech that has been criminalized would also be in tension with the fundamental rule prohibiting content-based restrictions on speech. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). The *Giboney* exception is best understood as a rationale for our "long established criminal proscriptions" on speech "intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298*; see also United States v. Hobgood*, 868 F.3d 744, 747 (8th Cir. 2017); *Burroughs*, 92 F. Supp. 3d at 1209 n.16.

Here, Mr. Mashaud's communications were found to be criminal conduct

because they fell within the statutory definition of stalking. As there is no suggestion that Mr. Mashaud's messages reflected an intent to induce or commence any other crime, this speech did not lack constitutional protection on the ground that it was integral to criminal conduct. *See United States v. Cassidy*, 814 F. Supp. 2d 574, 582–87 (D. Md. 2011) (finding defendant's disparaging and vulgar Twitter and blog posts about another person were not speech integral to criminal conduct and concluding interstate stalking statute was unconstitutional as applied).

Although the majority reviews some of the case law relevant to Mr. Boone's speech-integral-to-criminal-conduct argument, in the end it declines to decide the question and invites the trial court to address it on remand. *Ante* at 12–16. But this is a legal question, fully briefed and conducive to resolution by this court on appeal. *See Ifill v. District of Columbia*, 665 A.2d 185, 190 n.7 (D.C. 1995) ("The inquiry into the protected status of speech is one of law, not fact." (quoting *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983))).[7]

---

[7] Further, Mr. Boone never argued before the trial court that Mr. Mashaud's messages constituted "speech integral to criminal conduct." Although this court has the discretion to address this question on appeal rather than deem it forfeited—and there are good arguments here for doing so—it is not clear why Mr. Boone

(continued…)

Rather than leave the trial court with the confusing task of determining for a third time, in the absence of this court's interpretation of "constitutionally protected activity," whether Mr. Mashaud's communications were exempted from the stalking statute on that ground, we should hold that: (1) § 22-3133(b) limits the scope of the stalking statute to activity that falls within the established categories of constitutionally unprotected speech; (2) the trial court erred in determining that because Mr. Mashaud's email and Facebook messages involved private matters they were not constitutionally protected; (3) these messages did not become integral to criminal conduct simply by satisfying the elements of the stalking statute, and there is no other ground for holding that these messages were not protected by the Constitution; and (4) the trial court therefore had no basis to enter the civil protection order against Mr. Mashaud and that order should be reversed.

---

(…continued)

should get the benefit of having the trial court initiate a backup argument he never presented to that court and consider new bases on which Mr. Mashaud's messages might be unprotected. *See Tilley v. United States*, 238 A.3d 961, 969 (D.C. 2020) ("[We have] discretion, in the interests of justice, to consider an argument that is raised for the first time on appeal if the issue is purely one of law, particularly if the factual record is complete and a remand for further factual development would serve no purpose, the issue has been fully briefed, and no party will be unfairly prejudiced." (alteration in original) (quoting *District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 34 n.3 (D.C. 2001))); *see also id.* ("Normally, a claim that was not raised or passed on in the trial court will be 'spurned' on appeal." (quoting *D.D. v. M.T.*, 550 A.2d 37, 48 (D.C. 1988))).